[L. A. No. 15078. In Bank.—July 12, 1938.]

RANCHO SANTA MARGARITA (a Corporation), Respondent, v. MARGARET R. VAIL et al., Appellants.

504

506

O'Melveny, Tuller & Myers, Louis W. Myers, William W. Clary, Ward & Ward and John M. Ward for Appellants.

Hunsaker, Britt & Cosgrove and Cosgrove & O'Neil for Respondent.

THE COURT.—Defendants appeal on a bill of exceptions from a judgment adjudicating the water rights of plaintiff and defendants in and to the waters of the Temecula-Santa

Margarita River and its tributaries, located in Riverside and San Diego Counties, and enjoining defendants from interfering with the flow of the river except as provided in the judgment. At the outset it should be mentioned that on this appeal the questions presented for review all pertain to the rights of the parties as riparians.

The voluminous record presented for review is to be found in 11 printed volumes, supplemented with 4 large volumes of exhibits. The cause below was tried over a period of three years, and actually consumed 444 court days. The briefs of the parties total over 2,000 pages.

An examination of the pleadings and the record demonstrates that many issues were contested below that are now abandoned by appellants on this appeal. Among other things the rights of certain interveners were involved below and determined by the judgment. The correctness of this phase of the judgment is conceded.

The respondent brought this action primarily to secure a declaration of its riparian rights in the waters of the Temecula-Santa Margarita River, and its tributaries, and for an injunction to prevent appellants from using more than their reasonable share of the waters of the stream. The trial court determined that respondent was reasonably entitled to 75 per cent of the flow of the main stream, and that appellants were entitled to 25 per cent, and during the specified months of low flow enjoined appellants from using more than 25 per cent of the flow of the main stream measured as provided in the judgment.

Before discussing the issues presented on this appeal a brief description of each of the parties' properties, and of the river and its tributaries should be given.

The respondent is the owner of a tract of land situated in San Diego County originating in a single Mexican grant known as the Santa Margarita y Las Flores rancho, containing 133,440 acres. In the court below this property was referred to as the Santa Margarita ranch, and will be so referred to in this opinion. The western boundary of this ranch is the Pacific Ocean, along which it extends for about 17½ miles. The property extends easterly from the ocean a distance of about 15 miles.

The lands of appellants are situated in Riverside County east of respondent's ranch, and contain in all about 79,177

acres. The western boundary of appellants' land is about 10 miles easterly of the east boundary of respondent's ranch. Appellants' property consists of several contiguous tracts or grants, four of which originated in Mexican grants entitled Pauba grant, Temecula grant, Little Temecula grant, and Santa Rosa grant. In addition appellants own a 460-acre parcel contiguous to Little Temecula grant referred to below and in the briefs as the Vail government lands. These 5 parcels form one large irregularly shaped tract of land, frequently referred to in the trial court as the Vail ranch, and will be so referred to in this opinion.

The most easterly of appellant's properties is the Pauba grant, containing 27,662 acres. This tract was obtained by appellants as a single grant, and no part thereof has ever been conveyed away.

West of the Pauba grant, and contiguous thereto, are two other grants—the Temecula and the Little Temecula grants. The appellants own about ½ of the original Temecula grant. The portion they now own contains 10,402 acres and was obtained by them as a single grant. Located within the boundaries of the portion of this grant now owned by appellants are several fair sized parcels of land not now owned by appellants. Little Temecula grant is south of Temecula grant and west of Pauba grant, and contiguous to both. This was originally a single grant but in 1891 was partitioned by court order into 6 lots designated as lots A, B, C, D, E and F. Lots A, B, C and D have since been acquired by appellants and contain in all 1,726.73 acres.

Northwesterly of the Temecula grant, and contiguous thereto, is the Santa Rosa grant which contains 46,340 acres. This grant is riparian to certain tributaries of the Temecula-Santa Margarita River, but it is conceded on this appeal that no portion of this grant is riparian to the main river.

The Vail government lands containing 460 acres are south of Little Temecula grant and contiguous thereto. Appellants concede that this land is not riparian to the main river but contend, contrary to the finding of the trial court, that such land is riparian to a tributary of the main stream.

Through portions of the appellants' and respondent's ranches, for varying distances, there flows the Temecula-Santa Margarita River and its tributaries—a river, which, in the summer months, has a relatively small flow. The hy-

510

phenated name given to this river is used for the reason that in its upper portion it is called the Temecula River, while in its lower portion it is called the Santa Margarita River. The trial court found (finding 8) that ''the river or stream referred to in these findings as the Santa Margarita, and the river or stream referred to in these findings as the Temecula, is one and the same stream or river, and is hereinafter referred to as the Temecula-Santa Margarita River''. The respondent contends that the Temecula is a mere tributary of the Santa Margarita, and that it and another tributary—Murrieta Creek—unite to form the Santa Margarita. The respondent is in no position to challenge the above quoted finding.

The Temecula-Santa Margarita River has its source in the mountains about 20 miles southeasterly of the southeastern boundary of Pauba grant. After entering the Pauba grant it flows northwesterly through a portion of the grant known as Nigger Valley for a distance of a little over three miles. It then enters a narrow canyon on the Pauba grant known as Nigger Canyon through which it flows for a distance of about two miles. As the river leaves this canyon it debouches over a porous area referred to as ''the outwash area'', into which, except in times of heavy rains and floods, it disappears from the surface and percolates underground. In the dry season the river customarily reappears and becomes a surface stream on the Pauba grant about 3 miles westerly of the mouth of Nigger Canyon, and flows westerly across the western boundary of the Pauba grant. It then enters the Little Temecula grant through which it flows westerly for a distance of about 1½ miles. It then enters and flows westerly through a portion of the Temecula grant for a distance of about 1⅘ miles. After crossing the westerly boundary of Temecula grant the river leaves the lands of appellants. From the time the river enters the Pauba grant until it leaves the Temecula grant it flows entirely within the properties of appellants, except for a distance of about ¼ mile in the Temecula grant where the channel of the stream crosses a small parcel of land belonging to persons not parties to this action.

As the river leaves the westerly boundary of the Temecula grant it enters a narrow gorge known as Temecula Canyon or gorge. The trial court found that, although through much of its length the Temecula-Santa Margarita River has both

a surface and subsurface flow, all of the water—surface and subsurface flow—is brought to the surface at about the eastern end of Temecula gorge due to the existence of granite bedrock in the channel along the banks immediately easterly of this point. The court also found that the normal and usual surface flow of the Temecula-Santa Margarita River, at this point, when not artificially diverted, during the dry season of the year, amounts to 500 inches, exclusive of the flow of the Murrieta Creek.

After entering Temecula gorge the river flows westerly for about 10 miles through this canyon and on to the lands of respondent. Within this 10 mile stretch are a number of small users of water, a few of whom appeared in this action as interveners, and whose rights were fixed by the judgment. Neither appellants nor respondent question the propriety of the judgment insofar as it relates to interveners.

After entering the Santa Margarita ranch the Temecula-Santa Margarita River flows in a general southwesterly direction through the ranch for a distance of about 21 miles to the Pacific Ocean. After crossing the easterly boundary of the ranch the course of the river lies entirely within respondent's property until it empties into the ocean. The trial court found (finding 8) and the finding is not challenged, that after entering respondent's ranch, the stream does not flow as a continuous surface stream but "that in the dry and irrigating season of the year the surface stream customarily and ordinarily disappears, when not artificially interfered with, at a point on the plaintiff's lands approximately eight (8) miles from the ocean, sinking into the sands and gravels of its bed or channel, and again reappearing as a surface stream two (2) to three (3) miles below, and thence flowing as a surface stream of diminishing volume to its confluence with tidewater".

In describing the Temecula-Santa Margarita River generally the trial court found that in the dry summer months, when not interfered with, the stream flows from its headwaters to the ocean partly on the surface and partly under the surface, rising to the surface and flowing thereon in places and disappearing below the surface in other places.

The main river has several tributaries to which reference should be made. The most important tributary is Murrieta Creek, which joins the Temecula-Santa Margarita River in

Temecula grant about ½ mile east of the westerly boundary of that grant. This river has its source north of Temecula grant, and flows through that grant to its junction with the main stream. This tributary has a continuous yearly flow, but in the summer months the flow averages but 20 inches. On its course through Temecula grant the Murrieta crosses several of the parcels heretofore mentioned that are no longer owned by appellants.

The Murrieta has several tributaries. One of these is Santa Gertrudis Creek, which rises in the Pauba grant, flows for about 5 miles through that grant, then flows for about 4 miles through lands not owned by parties to this action, then crosses the extreme northeasterly tip of Temecula grant through which it flows for about ⅔ of a mile, and then leaves the lands of appellants flowing over lands not owned by parties to this action for about 3 miles to its junction with the Murrieta. The surface flow of this creek is not continuous, flowing only during the rainy seasons. Cottonwood Creek arises in the northerly portion of Santa Rosa grant, flows northerly through that grant for several miles to its junction with the Murrieta. This stream has no surface flow in the summer months.

The court found that separating the drainage area of the Temecula-Santa Margarita River from the drainage area of Murrieta Creek is a well defined crest line which separates the two watersheds. This crest line is referred to as the Temecula-Murrieta crest line. The effect of this crest line is to divide the drainage so that all of appellants' lands within Pauba and Temecula grants southeast of this crest line (amounting to 22,359 acres) drain directly into the Temecula-Santa Margarita River, while all of appellants' lands northwest of the crest line (amounting to 33,655 acres) drain directly into Murrieta Creek or its tributaries. The court also found that the Temecula-Santa Margarita River watershed upstream from its confluence with the Murrieta contains 373 square miles, and that the Murrieta watershed contains 258 square miles.

Another tributary of the Temecula-Santa Margarita River is Penjango Creek or dry wash. It has its origin south of all of appellants' lands, flows in a northwesterly direction across a corner of Little Temecula grant to its junction with the main river a short distance upstream from where the Mur-

rieta joins the river. This creek carries no surface water except in the rainy or flood season. There is a material dispute between the parties, hereafter discussed, as to whether the Penjango Creek touches the Vail government lands, and as to whether it has an appreciable underground flow.

Another tributary of the Temecula-Santa Margarita River is Sandia Creek, which has its source in the Santa Rosa grant through which it flows for several miles, then meandering southerly across lands not owned by parties to this action to its junction with the main stream just east of where the main stream enters the Santa Margarita ranch. Deluz Creek also has its source on the Santa Rosa grant, then flows southwest across lands not owned by parties to this action, and then enters respondent's ranch, where it joins the Temecula-Santa Margarita River. These two tributaries have their source north of the main river. South of that river is Fallbrook Creek, which flows through the Santa Margarita ranch in a westerly direction for almost all of its length. This tributary, as well as the others above described, flows mainly in the rainy season. Near where this creek joins the Temecula-Santa Margarita River on respondent's property, respondent has constructed a dam and created an artificial lake known as Lake O'Neill reservoir, used for irrigation purposes. This reservoir is used to store not only some of the waters of Fallbrook Creek, but also some of the waters of the main river where a diversion dam and ditch have been constructed.

Located on the Vail ranch along both sides of the channel of the main river is a large level valley or basin known as Temecula alluvial basin. This basin extends along the line of the river for about $8\frac{3}{4}$ miles, and varies from $\frac{2}{3}$ to $1\frac{1}{2}$ miles in width. The trial court found that this basin is entirely surrounded by hill lands, except where intercepted by the river, and is almost entirely composed of impervious mesa silt. At the trial appellants contended that a vast underground water plane underlay this ancient silt formation. This was one of the main issues presented to the trial court. The trial court found that no such common water plane existed, but that there were a few lozenges or lenses of pervious material in the mesa silt formation thus creating small suspended water planes in that formation. These findings are not challenged on this appeal, the appellants, in view of the

conflicting evidence, conceding that these findings are amply supported.

The basin itself is composed of porous materials—sands, gravels, boulders and other fluvial deposits—to a depth of several hundred feet. The upper ½ in area and ⅓ in length of this basin is filled with coarser and looser material than the balance of the area, and is called the outwash area of the basin. The outwash area contains 2015.48 acres. The balance of the basin is called the artesian area. The basin as a whole, and particularly the outwash area, creates a large underground basin into which the water of the river sinks, and in fact, in the dry season, into which it entirely disappears as a surface stream, reappearing again on the surface across the artesian area.

Appellants for many years have diverted water for irrigation both from the surface stream and from the underground basin. The trial court found that diversions from the basin were tantamount to surface diversions, finding that any pumping from the basin had the effect of diminishing the surface flow to the extent of the pumping, and also finding that there is no appreciable return from appellants' irrigation.

About 1900 the predecessors of appellants constructed, and until 1927 appellants maintained, on the Pauba grant, at about the upstream edge of the artesian area where the river reappears as a surface stream, an earthen dam across and intersecting the flow of the Temecula-Santa Margarita River. Water diverted by means of this canal and certain diversion works was used in portions of Pauba and Temecula grants riparian to the main stream. This diversion is referred to as the upper diversion. By means of this diversion the appellants and their predecessors for many years during the irrigation season have diverted the entire or nearly the entire surface flow of the stream in varying amounts from approximately 75 to approximately 200 miner's inches. In 1927, while this action was on trial, appellants abandoned this upper diversion and substituted for it the Tule pumping plant, about ⅘ of a mile downstream from the upper diversion. By means of this plant appellants divert the surface flow formerly diverted by the upper diversion.

In 1919, about 1 mile easterly from the upper diversion and about ⅓ mile northerly from the channel of the river, in Temecula alluvial basin in Pauba grant, appellants constructed a well and pumping plant designated as well No. 30.

By means of this plant appellants during the irrigation season have pumped between 1,000 and 1800 acre-feet annually, and have used the same for beneficial purposes on their riparian lands in Pauba and Temecula grants.

In 1922 and 1923 the appellants constructed the Cantarini pumping plant in Little Temecula grant. This plant draws water directly from the surface flow and from 3 wells sunk into the alluvial basin about 45 feet from the stream channel, and is capable of diverting practically the entire surface flow in the summer months. This water so secured is used partially on riparian lands, but the greatest part is used on lands in Temecula and Little Temecula grants not riparian to the main stream, and also an appreciable portion is used on the Vail government lands, found by the trial court to be non-riparian.

Also in 1922 and 1923 appellants remodeled and reconstructed another pumping plant—this one located in Temecula grant several miles downstream from the Cantarini plant, and called the Bridge pumping plant. This plant had been originally constructed in 1912, but had been only operated intermittently. In 1922 and 1923 two large power pumps that divert directly from the surface stream were installed. This plant has a maximum capacity of 260 miner's inches, and the water diverted thereby has been used for irrigation purposes partially on lands riparian to the Temecula-Santa Margarita River, and partially on lands in the Murrieta watershed.

In addition, for many years, appellants have maintained 4 artesian wells in different parts of the basin by means of which about 1 second-foot of water is withdrawn from the underground waters.

The trial court found (finding 17) that the waters diverted by appellants were applied and used upon the Vail ranch "in a relatively modern and scientific manner, for beneficial uses and purposes, including the irrigation of crops, the watering of livestock, and domestic purposes; that the proper cultivation and irrigation of said lands required the use of said waters at the times when and in the amounts so used". It was also found that until 1923 the appellants only diverted and used the amount of water to which they were reasonably entitled, and that prior to 1923 sufficient water remained in the stream to supply all of respondent's then reasonable needs. In the year. 1923 the appellants greatly increased their diversions,

particularly from the Bridge and Cantarini pumping plants, and, in the summer months, have conveyed away and threaten to continue to convey away 60 to 85 per cent of all the water of the Temecula-Santa Margarita River measured at Temecula gorge and naturally flowing therein during the irrigation season.

The main diversion on respondent's property is at Lake O'Neill reservoir. This reservoir has a capacity of about 1140 acre-feet and is located near the point where Fallbrook Creek joins the Temecula-Santa Margarita River. By means of a temporary earthen dam constructed in the river the surface flow is diverted during the dry season into this reservoir. Since 1886 it has been the custom of respondent not to construct this dam until about the middle of March of each year after the spring rains. The dam remains in the river until washed out during the next heavy rainy season.

There are also several wells and pumping plants operated by respondent. The appellants charged that these were crude and inefficient, and that a majority of them had been abandoned, and that respondent's methods of use were wasteful and inefficient. The trial court found (finding 19) that ''It is not true that the methods employed by the plaintiff and its predecessors in interest for the diversion or storage of said waters have at all times, or at any time, been crude or inefficient, or that the shortage of water experienced on said Santa Margarita ranch during the summer and irrigation season of the year 1923 and years subsequent thereto was in consequence of any unscientific, crude, careless or negligent structure or conduct employed on the part of or used by the plaintiff for the diversion of said waters into said reservoir. . . . but such shortage of water was due entirely to said unreasonable diversions of the defendants during the summer and irrigation season of said years . . . '' In finding 20 it is stated that ''one or two, but not a majority, of the wells and pumping plants on said Rancho Santa Margarita have fallen into disuse and into a condition of a lack of repair . . . but several well ordered and equipped pumping plants are now, and for several years last past have been, maintained and operated'' to withdraw the underground waters for useful and beneficial purposes on riparian land.

The trial court also found, and this finding is admittedly supported by the evidence, that the normal flow of the Temecula-Santa Margarita River is not sufficient to supply all the

riparian needs of all of the riparian lands of either respondent or appellants, and that there is only enough water available for the irrigation of a portion of their riparian lands and for the uses thereon which are most valuable and profitable. This was practically stipulated to by the parties, and was one of the basic facts upon which the action was tried.

After the appellants enlarged their diversions in 1923, the Temecula-Santa Margarita River was caused thereby to disappear as a surface stream on the Santa Margarita ranch some 6 miles further upstream than had theretofore occurred. This caused the respondent to investigate and upon ascertaining the facts, to vigorously protest to appellants. Unable to agree, this action was seasonably instituted by respondent in 1924. It is unnecessary to set forth a summary of the pleadings. Suffice it to say that the main relief sought by respondent was twofold: (1) for a determination of the relative rights of the parties as riparian owners in and to the waters of the Temecula-Santa Margarita River and its tributaries. In this connection respondent claimed it was entitled to 6/7 of the water of the stream; and (2) for an injunction to prohibit diversions by appellants beyond the extent of 1/7 of the total flow. The answer of appellants raised many other issues than the two above discussed. Appellants claimed a large portion of the waters of the stream by prescription; claimed respondent's action was barred by laches; claimed that underlying a large proportion of the Vail ranch was a common underground water table, and raised many other issues, all of which were decided adversely to their contentions, and have been abandoned on this appeal. In addition appellants put squarely in issue the extent of the parties' riparian acreage, the extent thereof that could be profitably irrigated, the quantity of water available, and challenged respondent's right to the injunction. Appellants claimed the right to 5/7 of the total flow of the river.

As already indicated, the trial court decided many of the issues raised by the pleadings in favor of respondent, and many of these important issues have been abandoned on this appeal by appellants. Speaking generally, so far as the issues raised on this appeal are concerned, it was incumbent upon the trial court to ascertain first the extent of the riparian acreage of each of the parties and the quantity of water available. In view of the admitted fact that there is insufficient water to irrigate all of said lands or for the other uses of the

parties, it was also necessary to ascertain the extent of such riparian acreage suitable for and capable of profitable irrigation. It was then incumbent upon the court to declare the rights of the parties in and to the water in dispute. Secondly, the court had to determine, considering all the factors required by the law to 'be considered, whether an injunction should be issued, and if so what its terms or conditions should be.

The trial court determined these issues in a series of exhaustive findings, and entered its judgment accordingly. Speaking generally, based on its findings as to riparian acreage, and extent thereof suitable for irrigation, and the quantity of water available, the court declared that respondent was entitled to ¾ of the surface flow of the Temecula-Santa Margarita River, exclusive of the flow of the Murrieta, and that appellants were entitled to ¼ of such flow plus 100 per cent of the flow of the Murrieta and its tributaries, all diversions from the underground basin by appellants to be considered as surface diversions, and further, that during the summer months appellants should be enjoined from diverting more than the quantity awarded them.

In connection with the declaratory features of the case the trial court found that the Santa Margarita ranch contains 133,440 acres, of which 38,739 described acres are riparian to the Temecula-Santa Margarita River; that the normal flow of the river is insufficient for all of the riparian needs of respondent; that there is sufficient water available for the irrigation of only a portion of the riparian lands and for those uses thereon which are most profitable and valuable; that of the total riparian acreage of respondent there are 12,375 described acres capable of and adapted to practical and profitable irrigation; that this described area is particularly suitable for the growing of citrus fruits and other crops; that for the proper irrigation of said area 30,289 acre-feet of water per annum is useful, valuable and necessary; that of the 12,375 riparian acres suitable for irrigation 10,190 acres are so located as to be free of frost and the growing season extends over the entire year; that the remaining 2,185 riparian acres suitable for irrigation are so located as to be annually visited by frosts and the growing season thereon extends over but 10 months; that of respondent's total riparian acreage 15,290 acres are rough and rugged and not susceptible of practical or profitable irrigation; that certain described areas are so saturated with water

as to be not suitable for the growth of crops, and other small areas require drainage; that 180 acres of said land are super-saturated, resulting in an alkali soil condition rendering the area totally unfit for the growing of crops. In connection with the actual present and past use of water by respondent (as distinguished from potential uses or needs discussed above) the trial court found that the surface waters of the Temecula-Santa Margarita River naturally diffuse themselves into and through the riparian lands contiguous to the stream, saturating large deposits of underground sands and forming and supporting underground stores of water; that in divers depressions in the riparian lands the water has always collected in surface pools, to which pools cattle and livestock of respondent have always been accustomed to resort for drinking; that for the past 40 years respondent and its predecessors have devoted the ranch largely to the raising and pasturing of cattle; that several thousand head of cattle are usually maintained thereon; that for 40 years past respondent and its predecessors during the summer months have taken the full flow of the surface stream for the purpose of watering livestock and to some extent for irrigation; that the amount of land actually irrigated by respondent in the past has been (finding 5) ''from about one hundred (100) to eight hundred (800) acres in different years'' (the evidence showing that in most years the area irrigated has been around 500 acres); that respondent's livestock that pasture along the river from Lake O'Neill reservoir upstream for a distance of 8 miles are dependent upon the surface flow of the river for a reasonable drinking supply; that the continued natural flow of the stream as fixed in the judgment is necessary for the watering of respondent's livestock and for respondent's domestic and irrigation uses.

As to appellants' lands, the court found that the Vail ranch totals 79,177 acres (finding 7) ''contacting throughout, and lying within the general watershed of the Temecula-Santa Margarita River and its tributaries''; that each of the 5 tracts owned by appellants was acquired by distinct lines of title and independent conveyances from the original sources of title; that Little Temecula grant was partitioned in 1892 into 6 parcels numbered lots A, B, C, D, E and F; that appellants own lots A, B, C, D; that lots A and B abut on the stream and contain 1277 acres riparian to the Temecula-Santa Margarita River; that lots C and D do not abut on the main stream or

any of its tributaries; that although originally all of Little Temecula grant was riparian to the river, in the decree of partition no reference at all was made to riparian rights of either the abutting or nonabutting lots; that lots C and D (containing 450 acres) are not riparian to the main river or any of its tributaries.

As to Temecula grant, as has already been mentioned, appellants own a little less than one-half of the original grant, and within the boundaries of this half are various parcels not owned by them. One of these parcels is the site of the unincorporated town of Temecula. It will also be remembered that the Temecula-Santa Margarita River and its tributary Murrieta Creek, join within the Temecula grant, and that there is a well defined crest line dividing the drainage areas of the two streams. The trial court found that these were separate watersheds. It found that appellants own 2,798 acres in Temecula grant riparian to the Temecula-Santa Margarita River, being all the lands of appellants in that grant lying south of the Temecula-Murrieta crest line; that appellants own 1362 acres of Temecula grant riparian to Murrieta Creek, being part of appellants' lands in the grant lying north of the crest line.

The court was not consistent in its conclusion that the lands of appellants in the Murrieta watershed were not riparian to the main river. It found that immediately north of the confluence of the Murrieta with the main stream, and north of the crest line, and within the Murrieta drainage area, in Temecula grant, the appellants own two parcels of land designated as lots 32 and 33—one of 106 acres lying east of Murrietta Creek and one of 87 acres lying west of the creek; that as to the 106 acre parcel it is so located with reference to the Temecula-Santa Margarita River and the other riparian lands of appellants within Temecula grant (finding 9) "that the surface drainage from said land is *directly into said Murrieta Creek,* and thence along the course of the surface channel of said Murrieta Creek *directly into said Temecula Creek* (Temecula-Santa Margarita River) entirely within and upon riparian lands of the defendants in said Temecula grant, and without passing, during any part of its course, over lands nonriparian to said Murrieta Creek or through or over lands not in the ownership of parties other than defendants.

"That other than said parcel of one hundred six (106) acres, there is no land of the defendants within the watershed

of said Murrieta Creek and lying within either the Pauba or Temecula grants, from which the surface drainage reaches the Temecula River or Creek without first passing through lands nonriparian to said Temecula Creek and in the ownership of parties not of record in this action" except the 87-acre parcel above mentioned which is "rocky, rugged and precipitous" and which "is not suitable or adaptable to cultivation either with or without irrigation". Under this and the preceding findings, except as to these two parcels which are an integral part of the Temecula grant, all of the lands in that grant riparian to the Murrieta are held nonriparian to the main river, but these two parcels based on what appellants call the "surface drainage theory", are held riparian to both streams.

Pauba grant is contiguous to both the Temecula-Santa Margarita River and to Santa Gertrudis Creek, a tributary of the Murrieta. The two drainage areas are separated by the Temecula-Murrieta crest line. The trial court separated the two watersheds. It found that appellants own in Pauba grant 17,375 acres riparian to the main river, being all of the Pauba grant south of the crest line. As to the balance of Pauba grant north of the crest line and lying within the Murrieta drainage area no finding was made as to riparian acreage.

The Santa Rosa grant is not contiguous to either the Temecula-Santa Margarita River or to Murrieta Creek, and appellants concede that the trial court correctly found that no part of said grant is riparian to those streams. The trial court found (finding 9) that 9,535 described acres are riparian to Deluz Creek "but no part thereof is susceptible of practical and profitable cultivation under irrigation with the waters of said creek", and that 10,270 described acres within the grant are riparian to Sandia Creek "but no part thereof is susceptible of practical and profitable irrigation with the waters of said creek". Other lands in this grant, without describing the acreage, are found riparian to Cottonwood Creek, a tributary of the Murrieta.

As to the Vail government lands appellants concede that this acreage is not riparian to the main river. The trial court found that it was not riparian to any of the tributaries of the main river. This finding is challenged by appellants, their contention being that the acreage is riparian to Penjango Creek.

After thus describing the riparian acreage of the appellants, the court found that of the acreage found riparian to the Temecula-Santa Margarita River, the following acreages within each grant (finding 10) were ''capable of and adapted to profitable and practical irrigation with water of and from said Temecula Creek or River . . . and suitable for habitancy and domestic irrigation and other uses and purposes'' and required the following quantities of water:

Temecula grant—1234 acres reasonably requiring 3,550 acre-feet per annum.

Little Temecula grant—947 acres reasonably requiring 1584 acre-feet per annum.

Pauba grant—1740 acres reasonably requiring 4,994 acre-feet per annum.

The court next finds that of the riparian lands of appellants within the Murrieta watershed within Temecula grant, 1,022 acres are capable of and adapted to practical and profitable irrigation, reasonably requiring 2,191 acre-feet per annum; that all of the lands of appellants found susceptible of profitable irrigation are suitable for the growing of various designated crops, but are so situated that they are annually visited by killing frosts, and the growing season thereon normally extends over but 8 months of the year.

On the subject of damage the trial court found that appellants' various pumping plants and diversion works are capable of pumping, and that it was appellants' intention to pump, from the surface flow and from the underground basin $2\frac{1}{2}$ to $3\frac{1}{2}$ times the amount of water to which appellants are lawfully entitled; that from 1923 to the time of trial appellants have taken 60 to 85 per cent of the total flow of all of the water in the river measured at Temecula gorge; that the effect of the increased withdrawals by appellants starting in 1923 has been to injure respondent in the irrigating seasons of 1923, 1924, 1925 and 1928 by causing the main river to cease to flow across the easterly portion of the Santa Margarita ranch as a surface stream approximately 6 miles further upstream than it had done prior to 1923; that as a result the stream ceased to afford water sufficient for respondent's cattle pasturing on the riparian lands and ceased to afford water sufficient for respondent's cattle to drink from the surface flow of said stream where they had previously been accustomed to drink; that in the irrigating seasons 1923–1928 (excluding the seasons of 1926–1927) from June 1st on in

each of the above years respondent could not and did not receive sufficient water to fill its Lake O'Neill reservoir and as a result respondent had insufficient water to irrigate its riparian lands; that no shortage occurred in 1926 or in 1927, but in the spring of those years heavy unprecedented and unusual rainstorms occurred in the Temecula-Santa Margarita River watershed.

The court also found that on both respondent's and appellants' properties the banks and channel of the river at places are covered with willows, and that at places on both ranches the river flows in an extremely wide and shallow channel exposed to the sunlight, resulting in large evaporation and transpiration losses.

After finding that the parties have correlative rights in the stream, the court finds that for the practical division of the waters of the stream the parties should maintain 6 measuring stations, describing them in detail, and that appellants must maintain measuring meters at their various pumping plants and wells; that by reason of the situation and condition of respondent's 12,375 riparian acres susceptible of practical and profitable irrigation requiring 30,289 acre-feet of water per annum (finding 33) "the plaintiff *owns* and reasonably claims the right, and is entitled to take and use on its lands riparian to said stream in Santa Margarita Ranch, as herein defined, seventy five one hundredths (75/100th) part of the water of said Temecula-Santa Margarita River, which naturally, when not artificially diverted or abstracted, flows and descends" in the main river as measured at station 6, located on respondent's property, after first deducting the flow of the Murrieta; that by reason of the situation and location of appellants' 3,853 riparian acres susceptible of practical and profitable irrigation requiring 10,128 acre-feet of water per annum "the defendants *own* and reasonably claim the right and are entitled to take and use on their lands riparian to said stream in said Vail Ranch, as herein defined, twenty-five one-hundredths (25/100ths) part of the water of said Temecula-Santa Margarita River which naturally, when not artificially diverted or abstracted, flows and descends in the channel" of the river as measured at station 6, after first deducting the full flow of the Murrieta; that this 25/100 of the flow of the river awarded to appellants is awarded to the separate grants of appellants as follows:

Temecula grant—8 8/10 of the total flow; Little Temecula grant—3 9/10 of the total flow; Pauba grant—12 3/10 of the total flow.

The court then finds that by reason of the situation and location of appellants' 1,022 acres riparian to the Murrieta susceptible of practical and profitable irrigation, requiring 2,191 acre-feet of water per annum, the appellants ''own'' and are entitled ''to take and use on their lands riparian to said stream in said Vail Ranch one hundred (100) per cent'' of the flow of the Murrieta and all. of its tributaries; that the flow of the Murrieta during the irrigating season (which the evidence shows is about 20 inches) is insufficient in volume, if attempted to be allocated between the parties, to be susceptible of practical apportionment or division. Similar findings are made as to Santa Gertrudis and Cottonwood Creeks. It is also provided that the small quantity awarded to interveners shall be deducted from respondent's share of the water.

It should be noted that in the above summarized portions of the findings, the trial court in declaring the rights of the parties first ascertained the riparian acreage susceptible to practical irrigation, then ascertained the quantity of water required for that acreage, and declared the rights of the parties based on that relation of those figures. Both as to irrigable acreages and as to duty of water as found by the court, the respondent is found to own 3 times as much irrigable riparian land and to require 3 times as much water as appellants own and require. It is not contended that either party has ever irrigated or intends to irrigate their entire irrigable riparian acreage. The findings and evidence clearly show the contrary.

In its conclusions of law and judgment the trial court provided that all waters taken from the Temecula alluvial basin by appellants by means of their wells and pumping plants should be treated as surface diversions; that appellants are not entitled to use water awarded to one grant on any other grant; and that defendants are not entitled to convey any water across the Temecula-Murrieta crest line except as to the two parcels located near the confluence.

After thus disposing of the declaratory features of the case the court found that respondent was entitled to an injunction, and in its judgment granted respondent an injunction:

1. Enjoining appellants from using the water awarded any one grant interchangeably upon any other grant.

2. Enjoining appellants from diverting any water to or using any portion of the waters upon lots C and D of the Little Temecula grant or upon the Vail government lands; and

3. Enjoining appellants from diverting from the surface flow or from the basin from May 1st to Oct. 31st of each year more than 25 per cent of the total flow of the stream measured at Temecula gorge. It is to be noted that the injunction prohibits appellants from diverting during the summer months approximately (the measuring points being different) the same quantity of water awarded to respondent in the declaratory portion of the judgment.

On this appeal appellants urge 5 main points:

1. The trial court erred in determining the amount of appellants' lands riparian to the Temecula-Santa Margarita River and to Murrieta Creek and its tributaries, and in allocating the waters of these streams on the basis of such erroneous determination;

2. The court erred in including within the lands of respondent found to be riparian 1200 acres of land not within the watershed of the Santa Margarita River;

3. Respondent is not entitled to any injunction;

4. The trial court erred in refusing to consider the subsurface flow of the stream and the underground basins in respondent's lands, and in sustaining objections to testimony regarding such subsurface flow and underground basins; and

5. The method imposed by the judgment for the measurement and division of the water between the parties is erroneous and violates substantial rights of appellants.

The first four of these contentions will be considered in order. Inasmuch as we are of the opinion, for reasons hereafter appearing, that a reversal is called for, the fifth point will not be discussed. The alleged errors claimed to have been committed in this regard, if any in fact exist (of which we have grave doubts) are not likely to occur on the new trial in view of the conclusions reached on the other points.

The appellants' first main contention is that the court erred in determining the riparian acreage owned by them. It is contended that as to each of appellant's five tracts of land the trial court either as a matter of fact, or by an erroneous holding as to the law, improperly excluded a material portion of their holdings from the riparian status. That a material

error in this respect is prejudicial to appellants, is obvious from the summary of the findings already made. As there appears, the trial court first found the extent of the riparian acreage of each of the parties. Then it found the number of those riparian acres that were capable of profitable irrigation. The available water was then awarded on the basis of the number of irrigable riparian acres owned by the parties, and the water requirement of those acres. It is obvious that if the trial court made an appreciable error in computing the riparian acreage owned by either party the proportion of irrigable riparian acres owned by each would undoubtedly have been different, and the award of water to each of the parties would necessarily have been different.

█ First as to Temecula grant. It is appellants' contention that the trial court committed prejudicial error in computing their riparian acreage in this grant in two respects:

1. In holding that the portion of the Temecula grant owned by them within the Murrieta drainage area was not within the Temecula-Santa Margarita watershed; and

2. In its findings as to the number of acres within Temecula grant owned by appellants that are riparian to Murrieta Creek. Both of these contentions, to a certain extent, involve the same question of law.

The trial court expressly held that as to respondent, the drainage area of the Murrieta and the drainage area of the Temecula-Santa Margarita River were separate and distinct watersheds. The appellants were specifically enjoined, for that reason, from transporting any water from either river across the Temecula-Murrieta crest line dividing the two drainage areas, except as to lots 32 and 33 at the confluence of the two streams.

It will be remembered that the Murrieta is a tributary of the Temecula-Santa Margarita River, and that it joins the main river on appellants' property within the boundaries of Temecula grant. As already pointed out, the trial court found that all of the Temecula grant owned by appellants south of the crest line was riparian to the main river (totaling 2,798 acres of which 1234 were found irrigable) and that north of the crest line appellants owned 1362 described acres in Temecula grant riparian to the Murrieta, of which 1,022 acres were found to be irrigable. The court also found that the 106 and 87 acre parcels at the confluence of the two streams, but located entirely within the Mur-

rieta drainage area, were riparian to the main stream for the reason (finding 9) that these two parcels were "so located with reference to said Temecula Creek (Temecula-Santa Margarita River) and other riparian lands of the defendants lying within said Temecula grant that the surface drainage from said land is directly into said Murrieta Creek, and thence along the course of the surface channel of said Murrieta Creek directly into said Temecula Creek, entirely within and upon riparian lands of the defendants in said Temecula grant, and without passing, during any part of its course, over lands non-riparian to said Murrieta Creek or through or over lands not in the ownership of parties other than the defendants''; that other than these two parcels (one of which is found to be non-irrigable) there is no other land of the appellants within the watershed of the Murrieta and lying within either Pauba or Temecula grants "from which the surface drainage reaches the Temecula River or Creek without first passing through lands non-riparian to said Temecula Creek and in the ownership of parties not of record in this action''.

Under these and other findings it was the theory of the trial court that, as to respondent, located more than 10 miles downstream from the confluence of the main river and the Murrieta, the lands of appellants in Temecula grant located in the Murrieta drainage area were not, except as to the two parcels already mentioned, riparian to the main river. The two parcels located north of the confluence differ from the balance of Temecula grant in the Murrieta drainage area owned by appellants (according to the findings) only in that surface drainage from these two tracts drains directly from them into the Murrieta, thence to the confluence entirely within the lands of appellants. As to the balance of the riparian area in Temecula grant in the Murrieta drainage area surface drainage is either directly into the Murrieta on appellants' lands or into the Murrieta across one of the small "islands" of land deeded away by appellants. One of these deeded out "islands" is the townsite of Temecula located on both sides of the Murrieta immediately north of the two parcels located north of the confluence. The result is that all surface drainage from the area now under consideration drains into the Murrieta, but before reaching the main river must cross the townsite of Temecula not owned by appellants, and in some cases crosses other of these deeded out parcels. As

far as the findings are concerned, it was apparently on this theory, referred to by appellants as the "surface drainage theory", and first advanced in the trial court by respondent's expert witness Finkle, that the trial court distinguished between the two parcels heretofore mentioned, and the balance of Temecula grant located within the Murrieta drainage area. Apparently, if the appellants had not deeded away the townsite of Temecula and the other small islands of land within the Temecula grant, the trial court would have held that all of the grant north of the crest line was riparian to the main river. As already stated, all of Temecula grant now owned by appellants was acquired by them as part of a single grant, and large areas of it have access to both rivers, and for about ½ mile below the confluence the grant is contiguous to the stream.

We think that the trial court was in error in holding, as to a downstream owner such as respondent, that the riparian lands of appellants in the Murrieta drainage area were not riparian to the main river. ■ It is well settled that the extent of lands having riparian status is determined by 3 criteria:

1. The land in question must be contiguous to or about on the stream, except in certain cases not now involved. The length of frontage is an immaterial factor. Thus in *Joerger* v. *Mt. Shasta Power Corp.*, 214 Cal. 630 [7 Pac. (2d) 706], a 40-acre tract with but a 250-foot contact with the stream was held to be riparian to the stream. An examination of the diagram contained in the opinion of that case demonstrates that the major portion of the surface drainage of the 40-acre parcel held to be riparian designated as parcel D, in order to reach the stream necessarily had to cross parcels B or C which had been deprived of riparian rights. (See, also, *Omnes* v. *Crawford*, 202 Cal. 766, 767 [262 Pac. 722].) Clearly under these cases, and others that could be cited, it is access to the stream, and not whether all surface drainage from the area in question drains directly into the stream at the point of access, that determines the riparian status of the land. These cases clearly refute the so-called "surface drainage theory". In the present case Temecula grant has access to both banks of the Temecula-Santa Margarita River for ½ mile below the confluence of the two streams and for 1½ miles above the confluence.

2. The riparian right extends only to the smallest tract held under one title in the chain of title leading to the present owner. (*Boehmer* v. *Big Rock Irr. Dist.*, 117 Cal. 19 [48 Pac. 908].) In the instant case all of Temecula grant owned by appellants is held under a title derived from a single source.

3. The land, in order to be riparian, must be within the watershed of the stream. (*Anaheim Union Water Co.* v. *Fuller*, 150 Cal. 327 [88 Pac. 978, 11 L. R. A. (N. S.) 1062].)

It is with requirement 3 that we are now particularly concerned. Specifically, the question presented is as to the correct definition of a watershed as to a riparian owner downstream from where two converging streams join; or, stated another way, as to such downstream owner, are lands located within the drainage area of a tributary within the watershed of the main stream?

It is appellants' theory that all of the 10,402 acres of Temecula grant owned by them are riparian to the Temecula-Santa Margarita River, as against respondent, a downstream riparian owner, regardless of the fact that the major portion of the area is within the drainage area of the Murrieta Creek. Appellants contend, and we agree with the contention (assuming the existence of requirements 1 and 2, *supra*) that as to any owner below the confluence of two branches of a stream, the drainage areas of both branches must be deemed to constitute a single watershed, where riparian land (at least in one single grant) is owned by the upper owner on both branches. Although there are many cases purporting to define the limits of a watershed, there is a paucity of authority on the subject in so far as the rights of the parties in lands bordering on converging streams are concerned. We have been cited to but two California cases (and independent research has disclosed no other) where the point was directly involved. The two cases are *Holmes* v. *Nay*, 186 Cal. 231 [199 Pac. 325], and *Anaheim Union Water Co.* v. *Fuller*, *supra*, both leading cases on various phases of our water law. The two cases when considered together, establish the law applicable to the rights of riparians on converging streams.

In the Holmes case, Nay owned a 101-acre tract (which we will designate as tract No. 1) through which the main stream flowed. After crossing the downstream boundary of tract No. 1, the main stream became one of the boundaries of a sec-

ond tract owned by Nay (which we will designate as tract No. 2). Immediately downstream from Nay's tract No. 2 were the lands of plaintiff Bernard, and below that some distance the lands of plaintiff Holmes, both areas being riparian to the main stream. Tract No. 2 was a separate tract from tract No. 1, and was a subdivision of a Mexican grant, as were likewise the properties of Holmes and Bernard. Flowing through tract No. 2 was a tributary of the main stream, which joined the main stream before the main stream reached the upstream boundaries of plaintiffs' properties. Separating the drainage area of the main stream from that of the tributary was a low divide or crest line. Purporting to act in the exercise of his riparian rights, Nay diverted water from the main stream in tract No. 1, conveyed it over the crest line, and used a part of it on that portion of tract No. 2 that was in the drainage area of the branch. So far as we are here interested the question thus presented was whether Nay in the exercise of his riparian right, could lawfully divert water from the main stream and use it within the drainage area of the branch as against lower riparians whose lands were located downstream from the confluence. Stated another way, against such lower riparians was the land within the drainage area of the branch riparian to the main stream? That is exactly the problem presented in the present case. The court in the Holmes case held, in effect, that as to lower riparian owners whose lands are located below the confluence, the drainage area of the main stream and that of the tributary must be considered one watershed. In this connection (at p. 240) this court stated: "It seems, also, that part of Nay's land lies between the main stream and a branch, the latter coming into the former before the stream reaches the land of either of the plaintiffs, so that some of Nay's land is in the watershed of the main stream above where the branch comes in and some is in the watershed of the branch. It seems also that Nay is taking the water from the main stream and using at least a portion of it on land in the watershed of the branch. This is complained of, but this he has the right to do. Both watersheds are but parts of the watershed of the stream as it passes the plaintiff's lands, and the rule that the owner of a tract of riparian land may not convey and use the water without the watershed of the stream has no application. The water is not conveyed and used without the watershed of the stream which passes the plaintiff's lands, and that stream

is the stream in which the plaintiffs have rights. They have no rights in the main stream and the branch above as separate streams. The situation is the exact converse of that presented in *Anaheim etc. Co.* v. *Fuller,* 150 Cal. 327 [88 Pac. 978, 11 L. R. A. (N. S.) 1062], where the junction of the stream and the branch was below the lands of the complaining riparian owner. Any other rule would be wholly impracticable and would, in many cases, practically destroy the riparian rights of an upper owner.'' This constitutes a direct and unequivocal holding that as to riparian lands downstream from the confluence the two branches constitute but one watershed. As will be noted from the above quotation from the Holmes case the court there held that the situation there under consideration was the exact converse of that presented in *Anaheim Union Water Co.* v. *Fuller, supra.* This last-named case is heavily relied upon by respondent to support the holding of the trial court in the present case. An examination of that case demonstrates that nothing contained in the opinion is contrary to what was later enunciated in the Holmes case—in fact, the rule of the Anaheim case serves to strengthen and explain the rule of the Holmes case. In the Anaheim case the defendant owned two tracts of land, tract No. 1 contiguous and riparian to the Santa, Ana River, and tract No. 2, adjoining tract No. 1, contiguous and riparian to Mill Creek, a tributary of the Chino Creek, which was a tributary of the Santa Ana River. Separating the drainage area of the main stream from that of its tributaries was a crest line. The plaintiff owned a tract of land contiguous and riparian to the Santa Ana River downstream from defendant, but *upstream* from the confluence of the river and Chino Creek. The defendant desired to divert from the main river on tract No. 1 and to use the water on tract No. 2 within the drainage area of the tributary. Obviously, water so diverted would be entirely by-passed around plaintiff's riparian lands located upstream from the confluence. The court very properly held that, where two streams unite, *with regard to lands abutting thereon above the junction,* the drainage area of each stream is a separate watershed. After stating the elementary rule that land not within the watershed is not riparian, and after referring to the findings adverse to defendant's contentions, the court stated (p. 330): ''The defendants claim that these findings are contrary to the evi-

dence and that this rule does not apply to the land they seek to irrigate, because, while it is wholly within the Mill Creek watershed, it is also within the general watershed of the Santa Ana River, considered as an entirety including the valley and the slopes leading thereto from its sources to its mouth. This fact does not affect the case, *at least so far as the land of the plaintiffs is concerned.* The principal reasons for the rule confining riparian rights to that part of lands bordering on the stream which are within the watershed are, that where the water is used on such land it will, after such use, return to the stream so far as it is not consumed, and that, as the rainfall on such land feeds the stream, the land is, in consequence, entitled, so to speak, to the use of its waters. Where two streams unite, we think the correct rule to be applied in regard to the riparian rights therein, is that each is to be considered as a separate stream, *with regard to lands abutting thereon above the junction,* and that land lying within the watershed of one stream above that point is not to be considered as riparian to the other stream. The fact that the streams are of different size, or that both lie in one general watershed or drainage basin should not affect the rule, nor should it be changed by the additional fact that the two watersheds are separated merely by the summit or crown of a comparatively low tableland, or *mesa,* as it is called in evidence, and not by a sharp or well-defined ridge, range of hills, or mountains. The reasons for the rule are the same in either case. In some cases it may be difficult to distinguish the line of separation. This seems to have been a case of that sort. Nevertheless, we think there is evidence sufficient to support the finding of the court that there is a dividing line between the two watersheds and that the land irrigated by defendants lies upon the slope which descends into Mill creek.'' (Italics added.) There is nothing contrary in this case to what was held in the Holmes case. In the Holmes case the protesting lower riparian, as in the instant case, owned land below the junction, while the party that desired to divert from the drainage area of the main stream to that of the tributary owned land on both branches above the confluence. In the Anaheim case both parties owned land on the same branch above the confluence. The two cases when considered together, supply a complete picture of the rights of riparians on converging streams. We find nothing in any other case directly touching upon the point now under discussion.

*Bathgate* v. *Irvine,* 126 Cal. 135 [58 Pac. 442, 77 Am. St. Rep. 158], the other case relied upon by respondent, is not helpful. While containing an interesting discussion of the reasons for confining riparian rights to lands within a watershed, it did not involve, nor did it discuss, the extent of a watershed where two streams join. While not directly in point, the cases of *Faulkner* v. *Rondoni,* 104 Cal. 140 [37 Pac. 883], *Verdugo Cañon Water Co.* v. *Verdugo,* 152 Cal. 655, 658 [93 Pac. 1021], and *Cheda* v. *Southern Pac. Co.,* 22 Cal. App. 373 [134 Pac. 717], contain language which support the conclusions herein reached. From what has been said it must be held that, as to respondent, all of appellants' riparian lands in Temecula grant within the Murrieta drainage area are within the watershed of and riparian to the Temecula-Santa Margarita River, and that the trial court's holding to the contrary was erroneous.

 As already pointed out, the trial court properly applied the rule of the Holmes case to a small part of Temecula grant within the Murrieta drainage area, that is to the two small parcels north of the confluence. These two lots are an integral part of Temecula grant. So far as the findings are concerned, the trial court distinguishes these two parcels from the balance of Temecula grant within the Murrieta drainage area, only in that surface drainage therefrom reaches the main stream via the Murrieta without crossing lands in the ownership of persons not parties in this action. This so-called "surface drainage theory" is unsound. It is predicated upon the concept that return drainage must reach the river entirely upon the riparian tract. As was said in *Pabst* v. *Finmand,* 190 Cal. 124, 130 [211 Pac. 11], "The fact that the water used upon riparian lands must be returned to the original stream is not a test of the riparian character of the land. It is but an incident of the riparian use." The test suggested by the trial court would mean that frontage on the stream would be the controlling factor in determining the amount of riparian land. The cases clearly hold that if a tract has any access to the stream at all (and the other requirements exist) the entire tract is riparian. (*Joerger* v. *Mt. Shasta Power Corp., supra; Omnes* v. *Crawford, supra.*)

 Respondent contends that the trial court considered several other factors in addition to the "surface drainage theory," and also contends that these factors serve to distinguish the instant case from *Holmes* v. *Nay, supra.* Re-

534

spondent urges that in the Holmes case the court was considering two small tracts of land in two small drainage areas, while the instant case involves two large tracts and two large drainage areas. Obviously the size of the drainage area has nothing to do with riparian rights. It is the situation of land within the watershed that is material. In determining the riparian status of land the same rules of law apply regardless of the size of the tract, the extent of the watershed or the amount of the run off. ▆ Respondent also seeks to support its contention by a reference to the admitted fact that there is not sufficient water for the riparian needs of either party. The amount of water in the stream has no bearing whatever in determining whether a particular tract is riparian. This argument is closely connected with another argument urged by respondent—that if appellants divert water from the main river to their riparian lands in the Murrieta drainage area the evidence shows that because of certain physical facts such waters will be entirely consumed in the Murrieta watershed. Assuming that the evidence is susceptible of this interpretation, that fact has no relevancy on the subject of the status of riparian land. Nor does the fact that appellants were awarded the full flow of the Murrieta in any way affect the question now under discussion. We are here discussing the status of land, not the quantity of water available. None of the other arguments advanced by respondent is convincing.

▆ Most of the arguments advanced by respondent would be of considerable weight in determining whether the diversion by appellants from the main river for use on their riparian lands in the Murrieta watershed would be a reasonable beneficial use. As between riparians each is, of course, limited to a reasonable use. It might well be, under the facts here presented, that the diversion of water across the crest line would be an unreasonable use, and if so, could be properly enjoined. The trial court did not pass on this issue, nor predicate its judgment thereon. It rested its judgment upon the holding that that portion of the Temecula grant within the Murrieta watershed was not riparian to the main river. That conclusion was erroneous, and for reasons already pointed out, prejudicial.

Respondent also urges that appellant Mahlon Vail, and one of appellants' witnesses, W. S. Jones, made certain admissions against interest sufficient to sustain the findings as to

the Murrieta drainage area constituting a separate watershed. The point requires but passing mention. A reading of the record demonstrates that no such admissions were in fact made. Respondent has misconstrued certain statements made in reference to an entirely different problem to apply to the problem now under discussion.

It is the next contention of appellants that the trial court committed reversible error in fixing the area owned by them in Temecula grant that is riparian to Murrieta Creek. With this contention we also agree.

The parties materially disagree as to the proper interpretation of the findings on this issue. It is conceded that north of the Temecula-Murrieta crest line within Temecula grant appellants own 7,604 acres. Appellants contend, and respondent admits, that this entire acreage is riparian to Murrieta Creek. Under the holding discussed *supra,* as a matter of law, this makes this area also riparian to the main river. It is appellants' contention that, based on the "surface drainage theory" the trial court found that but 1362 acres of Temecula grant were riparian to the Murrieta, and that the balance of over 6,000 acres, by necessary implication, were held to be nonriparian. Respondent contends that, properly interpreted, the findings provide that all of the Temecula grant north of the crest is riparian to the creek (thus abandoning the "surface drainage theory"), and further, that under the judgment appellants can use 100 per cent of the flow of the Murrieta upon any portion of this area. In fact, in volume 1 of its brief, page 335, respondent states: "The plaintiff-respondent so understands the judgment and *concedes* that by its judgment the trial court awarded to the defendants-appellants, as against the plaintiff-respondent, all of the waters of Murrieta Creek and all its tributaries for use upon all their lands lying within the watershed of Murrieta Creek." We cannot agree with respondent's interpretation of the findings and judgment.

As we read the findings, the court found that appellants own but 1362 acres north of the crest line and within Temecula grant that are riparian to Murrieta Creek, and, of these 1362 acres, but 1,022 acres are capable of and adapted to practical and profitable irrigation. As we read the judgment the trial court limited the use of Murrieta Creek waters to the 1362 acres above mentioned, plus the acreage of the two lots located at the confluence. The correctness of the finding

as to the extent of riparian acreage is obviously of fundamental importance. The trial court awarded the water on the basis of the comparative ownership of the parties of irrigable riparian land. The extent of *irrigable* riparian land is necessarily limited by the extent of the area found to be riparian. If 1,022 acres out of 1362 riparian acres are irrigable, it is a reasonable assumption that, if in fact 7,000 plus acres are riparian, the number of irrigable riparian acres is materially larger than the 1,022 acres found by the trial court. A material change in the appellants' irrigable acreage, under the theory of the trial court, would have resulted in a material increase in the award of water to appellant.

We turn, then, to an examination of the pertinent findings. In finding No. 9 the trial court first finds the acreage riparian to the main river south of the crest line, and then finds that north of the crest line in Murrieta watershed within Temecula grant appellants own "one thousand three hundred sixty-two (1362) acres riparian to said Murrieta Creek for a distance of about two (2) miles, and being those lands of the defendants shown on plaintiff's exhibits Nos. 191 and 201 as parcels or areas numbered 32, 33, 34, 35, 36, 37, 38, 39, 40 and 41, respectively". To have any effect this finding must be construed to mean that the 1362 acres constitute the extent of the riparian acreage owned by appellants in Temecula grant north of the crest line. By necessary implication the balance of over 6,000 acres owned by appellants in that area must be nonriparian. In finding 10 it is stated that: "Within the boundaries and being that portion of defendants' *riparian lands* (obviously referring back to finding 9 above quoted) capable of and adapted to practical and profitable irrigation with water of and from said Murrieta River or Creek . . . is, and always has been a body of land capable of and adapted to practical and profitable irrigation with water of and from said Murrieta River or Creek of about one thousand and twenty-two (1022) acres in area." In other findings the court fixed 2,191 acre-feet per annum as the quantity of water reasonably necessary to irrigate these 1,022 acres. In finding 33 it is provided that appellants own "and are entitled to take and use *on their lands riparian to said stream* in said Vail Ranch one hundred (100) per cent of the water of said Murrieta River or Creek, and all its tributaries . . . " Under paragraph 7 of the judgment appellants are restricted in their use of the 100 per cent of the flow of the Murrieta awarded to them to their

lands "lying within the Temecula grant, Riverside County, California, *riparian to the Murrieta Creek, as delineated and defined in the findings herein*".

In view of these various provisions it must be held that by the findings and judgment the trial court fixed 1362 acres as the area that is riparian to Murrieta Creek, and limited appellants in their use of the waters of this creek, to these 1362 described acres, thus depriving the balance of the area, totaling over 6,000 acres of its riparian status—6,000 acres that respondent admits are in fact riparian.

A reference to the various exhibits, particularly to certain topographical maps, indicates that the trial court apparently based its 1362 acre finding on the "surface drainage theory", because it appears from those maps that the 1362 acres described in finding 9 are the only acres north of the crest line within Temecula grant where the surface drainage therefrom is directly from such land into the creek. The balance of 6,000 plus acres drains into the creek, but the surface drainage therefrom must cross one of the deeded out parcels not owned by appellants and heretofore mentioned. This theory has already been held unsound.

We now turn our attention to Pauba grant. This grant is traversed by two streams. The Temecula-Santa Margarita River flows across this grant for a distance of about 11 miles. The northern portion of the grant is traversed by Santa Gertrudis Creek, a tributary of the Murrieta. The trial court found that the 17,375 acres of this grant south of the crest line and within the drainage area of the main river are riparian to that river and that of these 17,375 riparian acres 1740 acres were capable of and adapted to practical and profitable irrigation reasonably requiring 4,994 acre-feet of water per annum. The balance of the grant, consisting of 10,287 acres is within the drainage area of the Santa Gertrudis Creek. As to this area appellants were awarded 100 per cent of the flow of the creek, but were denied the use of any water from the main river, on the theory that such area was not riparian to the main river. Under the doctrine of *Holmes* v. *Nay, supra,* already discussed in detail, this was clearly error. We again repeat what was said concerning a similar problem in reference to Temecula grant—we are here considering only the riparian status of the land involved, and are not considering whether it would be a reasonable beneficial use of the water of the main river to convey the

same across the crest line and use it on land riparian to the tributary. This last problem was not passed on by the trial court and will have to be passed upon on the retrial.

We next turn our attention to Little Temecula grant. Admittedly, this entire Mexican grant was originally riparian to the Temecula-Santa Margarita River. Thereafter, the rancho passed from the original patentee in successive transfers and conveyances as a single tract. In 1892 the grant was owned by 6 people as tenants in common. In that year, pursuant to a decree of partition, the grant was partitioned into 6 parcels labeled parcels A, B, C, D, E and F, one parcel being allocated to each of the tenants in common. Appellants subsequently acquired parcels A, B, C and D. Parcels A and B are contiguous to the river. Parcels C and D do not abut on the river or on any tributary. In finding 7 the trial court found: "that in said decree of partition no provision is made for riparian rights as to any of said lots, and said decree is silent relative thereto; that said lots C and D do not abut upon, are not contiguous to, do not remain and are not riparian to said stream or any of its tributaries . . . " The two parcels each contain 225 acres. The evidence shows that in the past these two parcels have been irrigated from the Temecula-Santa Margarita River by appellants.

The question thus presented can be stated as follows: When a riparian tract is partitioned by decree, and the decree is entirely silent as to riparian rights, do the noncontiguous parcels lose their riparian status? The trial court answered this question in the affirmative. In support of the trial court, respondent urges that there is no distinction, in legal effect, between a grant deed and a decree of partition, and relies on the well settled rule that where the owner of a riparian tract conveys away a noncontiguous portion of the tract by a deed that is silent as to riparian rights, the conveyed parcel is forever deprived of its riparian status. (*Anaheim Union Water Co.* v. *Fuller*, 150 Cal. 327, 331 [88 Pac. 978, 11 L. R. A. (N. S.) 1062].) The appellants urge that this rule applicable to grant deeds has no application to a partition decree. With this contention we agree. There is a fundamental distinction between a grant deed and a partition decree. In a grant, the grantor has title to the land subject to the grant. The proposed grantee has nothing, and therefore the grantee secures only such title as is granted. When

the grant is silent as to riparian rights obviously such rights have not been conveyed and remain with the grantor for the benefit of his retained lands and for the benefit of other riparians. If the grant deed conveys the riparian rights to the noncontiguous parcel, that parcel retains its riparian status. But a partition decree involves an entirely different legal situation. In a partition, there is no change of title between the tenants in common—it is simply a dividing up of what the parties already own. After the partition each tenant in common has exactly the same proportional interest in the property that he had prior thereto. The only difference is that now his interest is in severalty, while prior to the partition it was in common.

Although not dealing directly with the subject of riparian rights, there are many cases recognizing these principles. In the early case of *Wade* v. *Deray,* 50 Cal. 376, 380, this court, in discussing the essential nature of a partition decree, stated: "It is well settled that a decree or judgment in partition has no other effect than to sever the unity of possession, and does not vest in either of the co-tenants any new or additional title. After the partition each had precisely the same title which he had before; but that which before was a joint possession was converted into a several one." In *Bennett* v. *Porter,* 180 Cal. 736, 742 [183 Pac. 156], in discussing this same point it was stated: "A simple partition does not change the title, nor transfer it from one to the other, nor return or restore to either party anything lost by him, or of which he had been deprived. It merely transforms the right of common possession of the whole tract into a right to the exclusive possession of the same interest or share, as represented by the parcel set off to him in severalty. He thereafter holds in severalty that interest which he previously held in undivided form. He does not recover the segregated parcel, nor even the possession thereof, but keeps such possession and thereafter excludes the other tenants from that parcel." In *Rose* v. *Mesmer,* 142 Cal. 322, 328 [75 Pac. 905], it was recognized that these general principles were applicable to a partition of riparian lands. The exact holding of the court was, that where a partition decree specifically refers to the riparian right and confers such right upon certain designated parcels (some of which were non-abutting), the parcels that were not mentioned as to riparian rights, by necessary implication, were deprived of such rights. It

was also held that the owners of the ranch before partition held riparian rights in the creek extending to the entire area of the ranch and that at that time each tenant in common owned an undivided portion of the riparian right. The court stated: "A judgment in partition is a mere severance of the unity of possession and community of interest, and does not in any other respect affect the character of the title or estate, unless it expressly so declares. (*Christy* v. *Spring Valley Water Works*, 68 Cal. 73, 75 [8 Pac. 849]; *Wade* v. *Deray*, 50 Cal. 376, 380.)"

Under these cases we think that it necessarily follows that upon the partition of riparian lands, the decree being silent as to the division of riparian rights, each parcel retains its water right. Prior to the partition each tenant in common owned a proportional interest in all of the land which included a share of the riparian right. The riparian status extended to the entire tract. After the partition each tenant in common owned in severalty what he formerly owned in common. The riparian right could be severed from any parcel if the parties so intend, but where the decree is silent on the division of riparian rights, it is reasonable to assume that the parties intend that each tenant in common should keep all rights attached to his parcel.

In 25 California Jurisprudence, page 1087, section 94, these principles are recognized in the following language:

"Effect of Partition—Upon partition of a riparian tract each parcel retains an undivided interest in the riparian right of the entire tract, even though it may not abut on the stream, *and no specific mention of water rights is made in the decree.* But of course the rule is otherwise where the decree by express language deprives any parcel of its former interest in the water rights. A judicial partition does not change the character of the water right belonging to land from riparian right to one appurtenant, even if some of the parcels do not abut upon the stream."

Respondent contends that the italicized portion of the above quotation is not supported by the authorities cited. It is true that the cases cited in the article do not directly support the conclusion in question. There appears to be no case in California where the subject now under discussion has been directly passed upon. However, we are of the opinion that the cases cited in California Jurisprudence,

*supra,* as well as the cases heretofore quoted discussing the nature of a partition proceeding lead inevitably to the conclusion found in the above quotation.

Respondent places considerable reliance on the case of *Strong* v. *Baldwin,* 154 Cal. 150 [97 Pac. 178, 129 Am. St. Rep. 149], as establishing its contention that the rules applicable to grant deeds are likewise applicable to partition decrees. In that case, in the partition decree, riparian rights were awarded to the various parcels as therein specified. In addition, deeds were executed which also specifically mentioned the riparian rights. The court held that both under the decree and the deeds the riparian rights were preserved even as to nonabutting parcels. Respondent contends that by this holding it has been established that the legal effect of a partition decree and a grant deed are identical on the problem here presented. This is a clear *non sequitur.* A holding that where either by deed or decree riparian rights are *expressly preserved* to noncontiguous land the two are identical in legal effect does not constitute a holding that both have the same legal effect when they are *silent* as to riparian rights. As to this situation as already pointed out, there are cogent and convincing reasons why in the case of a partition decree the riparian rights should be preserved, while a contrary conclusion should be reached in the case of a grant deed.

From the above analysis it follows that lots C and D in Little Temecula grant did not lose their riparian status by the partition of 1892, and that the trial court committed prejudicial error in holding to the contrary.

We now turn our attention to the 460-acre parcel of appellants' ranch known as the Vail government lands. In finding 7 the trial court found: "That no part of said Vail government lands is riparian to said Temecula-Santa Margarita river or any of its tributaries." By paragraph Sixteen of the judgment appellants were enjoined "from diverting or abstracting . . . the surface or sub-surface flow, or any part thereof, of the Temecula-Santa Margarita River or the Murrieta Creek or any of their or either of their tributaries, or the underground waters, or any portion thereof, of the Temecula alluvial basin or the Murrieta Alluvial basin, and transporting said waters to or upon or using said waters for any purpose, beneficial or otherwise,

upon the whole or any part of . . . that certain . . . tract
commonly known as Vail government lands''. Appellants
urge that the finding is unsupported and that the evidence
shows that this tract is riparian to Penjango Creek. The
trial court found that Penjango Creek or dry wash is a
tributary of the Temecula-Santa Margarita River. Appel-
lants contend that this creek has a winter flow of water;
that the creek flows through a sandy and porous area and
that there are substantial quantities of water in the under-
ground sands. Appellants concede that this tract is not
riparian to the main stream, but contend that they have
been deprived of their legal right to use the underground
waters of the creek on this area. The record discloses that
at the trial it was appellants' main theory that underlying
this tract and the lands contiguous to the main river was
a common underground water plane. This theory was found
not in accordance with the facts by the trial court, and
appellants have abandoned the contention on this appeal.
The only ''evidence'' referred to by appellants (aside from
various statements as to what the record shows unsupported
by transcript references) to support its contention that this
tract is in fact riparian to Penjango Creek, are certain maps
which were introduced on an entirely different subject, and
which, among other things, show Penjango Creek is the
southerly boundary of the tract. Other maps show that the
creek bed does not extend to the Vail government lands.
Other maps are not clear on the point. Respondent refers
us to evidence to the effect that the stream bed is not porous,
and that whatever underground water exists is lost by evap-
oration. The point is a relatively minor one, involving only
the water in Penjango Creek and its underground basin,
if any. In the present state of the record we would be
inclined to affirm the trial court on this issue, but in view
of the necessity of a retrial on other issues, this issue of fact
should also be reconsidered on the retrial, so that the parties
can cure the present unsatisfactory and confusing state of
the record on this issue.

 In connection with the Santa Rosa grant it is con-
ceded by appellants (p. 138, Opening Brief) that ''no part
of the Santa Rosa grant is contiguous to the Temecula-Santa
Margarita River, and appellants do not claim the right as
riparian owners to put any water of the Temecula river

upon this grant''. The trial court found (finding 9) that of the Santa Rosa grant 9,535 acres are riparian to Deluz Creek and 10,270 acres are riparian to Sandia Creek; both tributaries of the main river, but that no part of either of these two riparian areas is ''susceptible of practical and profitable irrigation''. It is conceded that there was no direct evidence at all introduced by either of the parties to this appeal to support this quoted portion of the finding. Respondent, however, contends that under the pleadings, on this issue the burden of proof was on the appellants, and that since appellants introduced no evidence thereon, the trial court properly found against appellants. To use respondent's own language its theory is (Res. Brief, vol. I, p. 365) that ''Where a party makes an affirmative allegation in an answer and offers no evidence in support thereof, the trial court must make a finding against the affirmative allegation.'' Respondent cites 10 cases which it contends support the rule. An examination of the cited cases, and others, demonstrates that the statement of the rule by respondent is much too broad. ██ The true rule, supported by the authorities cited by respondent, and others, is that (a) new matter set up in the answer, which creates a new issue, causes the burden of proof to shift to defendant; and (b) that if no evidence is introduced upon any issue the finding will be against the party having the burden of proof. (*Vanderslice* v. *Matthews*, 79 Cal. 273, 278 [21 Pac. 748]; *Monterey County* v. *Cushing*, 83 Cal. 507, 509 [23 Pac. 700].) The test is not whether the answer contains an affirmative allegation, but whether new matter which creates a new issue is contained in the answer. A plea controverting the original cause of action and tendering no new issue is a mere traverse and cannot be properly described as a plea setting up new matter. (*Frisch* v. *Caler*, 21 Cal. 71, 75.)

In the instant case the plaintiff-respondent alleged in its complaint that on the basis of the amount of irrigable and riparian land owned by each party it was entitled to 6 times as much water as appellants. The burden of proof on this issue was on respondent. The answer of appellants denied that the amount of irrigable riparian land owned by respondent was six times, or at all, greater than that of appellants, and set forth affirmatively the amount and location of the lands claimed by them to be riparian and irrigable.

In this connection appellants alleged that certain lands were riparian to the two creeks. Nothing in appellants' answer created any new issue on the subject of the irrigability of these areas. That issue was created by the complaint. We think the respondent assumed the burden on this issue, and that therefore the finding is unsupported.

Respondent makes some effort to show that although it introduced no evidence on the issue, appellants' own evidence tends indirectly to support the finding. The appellants contend, with some logic, that the evidence is not susceptible of the inferences indulged in by respondent. We do not find it necessary to pass on this contention. For present purposes it suffices to state that the burden of proof on this issue on the retrial is on respondent. Although the acreage involved on this point is large, the amount of water in the two creeks is very small. In fact in the summer months both creeks are dry. There was no evidence that any portion of the two areas found riparian to the creeks has ever been cultivated or irrigated by appellants. In view of the necessity for a retrial or more important issues, the issue of the extent of the irrigability of these lands found to be riparian can be ascertained on such retrial. This is the only issue in reference to Santa Rosa grant that need be retried.

Before proceeding to the second major contention of appellants, the various holdings on appellants' first contention (that error was committed in determining the extent of appellants' riparian and irrigable acreage) can be summarized as follows:

1. The trial court committed error in holding that as to Temecula and Pauba grants the portions of said grants riparian to the Murrieta or its tributaries were not riparian to the main stream.

2. The trial court erroneously determined that but 1362 acres (plus the two small parcels at the confluence) of the Temecula grant were riparian to the Murrieta.

On the retrial the extent of the riparian acreage in these two grants north of the Temecula-Murrieta crest line will have to be redetermined, and likewise the trial court will have to determine the extent of such acreage that is irrigable.

3. The trial court erroneously determined that lots C and D of Little Temecula grant were not riparian to the Temecula-Santa Margarita River. As a matter of law these two

parcels are riparian to the river. On the retrial the extent of the irrigable acreage in the two parcels will have to be ascertained.

4. In view of the unsatisfactory condition of the record on the issue, the exact course of Penjango Creek should be determined, and it should be ascertained whether the Vail government lands are riparian thereto. This issue involves solely the waters of the creek, and in no way affects appellants' rights in the waters of the main river.

5. For reasons already stated the trial court should retry the issue as to the extent of the irrigable acreage owned by appellants riparian to Deluz and Sandia Creeks, keeping in mind that the burden of proof is on respondent. This issue involves solely the waters of the two creeks, and in no way affects appellants' rights in the waters of the main river.

█ Points 1, 2, and 3, *supra,* are of particular importance. While it is true, in view of the stipulated and admitted fact that there is not sufficient water in the main river for the reasonable beneficial uses of either of the parties and that the main issue on the declaratory phase of the case is not as to the extent of the riparian acreage of the parties, but is as to the extent of their *irrigable* riparian acreage, nevertheless a material error as to riparian acreage is obviously prejudicial, because we have no way of knowing how much of the land erroneously held to be nonriparian may be irrigable. A material difference in the relative ownerships of irrigable acreage, under the theory of the trial court, would call for a different division of the waters.

In this connection, on the retrial, the court should determine not only the irrigable riparian acreage, but also should pass upon the question as to whether, under all the circumstances, the conveying of the waters of the main river across the crest line for use on Temecula or Pauba grants in Murrieta watershed would constitute a reasonable, beneficial use of such waters.

█ The second major contention of appellants is that the trial court erred in including within the lands of respondent found to be riparian some 1200 acres of table land which appellants maintain are not within the watershed of the Temecula-Santa Margarita River.

█

The trial court found that respondent owned 38,739 acres of land riparian to the Temecula-Santa Margarita River of which 12,375 acres are capable of and adapted to practical and profitable irrigation. Appellants challenge these findings only in so far as they include certain table lands situated north of the mouth of the river and contiguous to the Pacific Ocean. This table land was found to be riparian and irrigable. It is appellants' contention that this area, which they contend includes about 1200 acres, according to respondent's own evidence, slopes and drains not towards and into the river, but towards and into the Pacific Ocean, and for that reason is not within the watershed of the Temecula-Santa Margarita River.

A reading of the record presented for review demonstrates that during the trial there was presented, as one of the controverted issues, the question as to the exact location of the crest line dividing this mesa land from the drainage areas to the north and northwest. On this subject much expert and lay testimony and many maps and exhibits were introduced. This appellants concede. A reading of this mass of technical testimony indicates that some portion of this table land (probably considerably less than the 1200 acres claimed by appellants) does not slope or drain directly towards the river, but slopes roughly parallel thereto, and that, whatever drainage exists, is towards the beach bordering the Pacific Ocean and over the cliffs or palisades immediately adjacent thereto. As to a portion of this table land there is material, competent evidence to support respondent's contention that the drainage is towards and into the river.

One of respondent's principal expert witnesses—Mr. Finkle—testified that some of the area involved (the exact limits of which we are unable to ascertain) in ordinary winters had no drainage at all, but that in years of heavy rainfall what drainage there was ran parallel to the river over the cliffs or palisades down to the beach; that along the beach there exists what he called a "barrier beach", that is a rough depression built up by the winds, waves and drainage; that, although some of the water draining over the cliffs from the mesa above seeps through the barrier beach into the ocean, whenever any appreciable water drains over the cliffs, the barrier beach causes it to drain towards and into the mouth of the Temecula-Santa Margarita River;

that the line of this drainage along the barrier beach is not along a "living stream"—it is along a ravine, or draw, or depression—but it is not a stream; that this ravine, or draw or depression only contains water on rare occasions when there is a flood.

Finkle testified as to the existence of this barrier beach, and as to his theory as to why this beach rendered the table land riparian to the main river, early in February, 1927. Later that month, and while the trial was still in progress, there occurred an unusually heavy rainstorm. An examination made immediately thereafter disclosed that the storm had broken the alleged barrier· beach in many places, so that the drainage from the table land was directly into the Pacific Ocean. This, of course, completely refuted Finkle's statement that whatever drainage there was from the table land was over the cliffs and along the barrier beach into the river. Finkle explained this on the theory that in the 1927 storm the wind blew from the south; that a wind from that direction would have a tendency to destroy the barrier beach; that normally along the beach the wind blows from the north; that such a wind would have a tendency to build up and strengthen the barrier beach; that "this north barrier beach is one so immature that disturbances due to winds and storms have a very vital effect on it, and for that reason no one can state anything about it except for the time when the observation was made".

From an analysis of this, and the other testimony, it seems clear that whatever the area may be that slopes towards the ocean and drainage therefrom drains over the cliffs, that area cannot be held to be riparian on the theory that the water drains along the beach into the mouth of the river. To hold in accordance with respondent's contention would mean that in one year when the wind was from the south the area would be nonriparian, but in another year when the wind was from the north, the area would be riparian. Riparian rights do not depend upon such an unstable and changeable factor as wind direction, but upon the three factors already fully discussed, *supra*.

Respondent, however, does not rely entirely on the barrier beach theory to establish the alleged riparian character of the table land in question. It presented geological testimony that in past geologic ages this mesa or table land

was created by action of the river. In other words, its geologists testified that this mesa land was originally delta land, and that through the ages it has now become mesa land. Based on this premise, respondent contends that such delta land, on the authority of *Half Moon Bay* v. *Cowell*, 173 Cal. 543 [160 Pac. 675], even though it slopes away from the river and is now many feet higher than the river, nevertheless is riparian thereto. An examination of that case. discloses that its holding cannot be distorted so as to sustain such a contention. In that case the court was considering the status of 66 acres of *existing* delta land near the outlet of the stream. The evidence showed that, because of the action of the floods in bringing debris and silt down the stream, during the course of time, the bed of the stream had become slightly higher than the surrounding delta, and that such area was periodically flooded by waters from the stream. In holding that this delta land was riparian to the stream, although sloping away therefrom, this court (p. 547) stated: "This sixty-six acres of the plaintiff's land lies in the flat territory bordering upon the ocean near the outlet of the creek. It can scarcely be said to have any grade or slope. The proof indicates that its general slope is toward the ocean and from a fourth to a half of one per cent from horizontal. In delta land situated at the lower end of the stream, the water in the bed of the stream is often higher than the adjacent land, and that was the situation in the case at bar. This occurs to land properly within the watershed and from natural causes. The torrential flow from the steeper grades carries the debris down to the flat land, where it is deposited, raising the bed above the level of the land adjoining. It would be an extremely unwise and unjust adherence to a supposed rule to declare that land thus made to slope away from the stream is thereby deprived of the riparian character and rights." The rule thus announced is a correct and salutary one, but only applies to a present and existing delta. The mesa land here involved is at the top of the palisades many feet above the river bed. Water from the river, even in the heaviest floods, could not conceivably ever overflow this area. The rule of the Half Moon Bay case, applying to a present, existing delta, cannot be properly applied to mesa which in past geologic ages may have been delta land. In past ages this mesa land may have

been delta land, and may have been riparian to the river, but riparian rights are not determined by past geologic formations but by the present natural topography.

We are unable to accurately determine from the record the exact location and area of the land that drains over the cliffs and onto the beach, and which for reasons already stated, should have been held to be nonriparian. This matter can be cleared up on the retrial. Inasmuch as appellants do not challenge the findings as to extent of respondent's riparian acreage, or the extent thereof that is irrigable, except as to this table land, no further trial is necessary on this issue except as to that area. As to the balance of the area the findings are amply supported.

We now turn our attention to appellants' third main contention, viz., that under the facts, respondent is not entitled to an injunction. So far we have discussed the extent of each party's riparian acreage, and the extent thereof that is susceptible to profitable irrigation. Based on the irrigable riparian acreage owned by the two parties, and upon the duty of water, the trial court determined, as already pointed out, that respondent was entitled to 75 per cent of the surface flow of the Temecula-Santa Margarita River (less the small quantity awarded to interveners) and that appellants were entitled to 25 per cent of the flow of that river, plus 100 per cent of the flow of the Murrieta and its tributaries. If the riparian (and irrigable) acreages as found by the trial court had been correct as to amount (but as already held they were not) the declaratory portions of the judgment would have been proper. In addition to declaring the rights of the parties the trial court likewise enjoined appellants, during the irrigation months, from using more than the quantity of water awarded to them by the declaratory portions of the judgment. In so doing, it is appellants' contention that the trial court confused the declaratory and injunctive features of the case, and based the injunction not on the actual present needs of the parties, but upon the areas owned by each susceptible to irrigation. It is appellants' main contention on this phase of the appeal that, considering the surface and sub-surface water available in and from the Temecula-Santa Margarita River, respondent has never suffered any shortage of water; that there exist three large underground basins of water on respondent's

land filled to the brim, but that respondent has made little or no use of such available supply; that considering this supply, respondent has not suffered any shortage, there being ample water therein for respondent's present needs; that the main use respondent has made of the available water in the past is for watering cattle from the surface stream; that under the circumstances here disclosed, considering all pertinent factors, the maintenance of the underground basins full of water for the purpose of supporting the surface stream in order that cattle may be watered from the surface stream is a wasteful and unreasonable use of the waters of the stream; that since respondent is not making a reasonable use of the entire stream, including the underground basins, no legal basis exists for the granting of the injunction.

The portion of the injunction here complained of is found in paragraph seventeen of the judgment. By it appellants are enjoined "from diverting or abstracting, from either or both the surface flow of the Temecula-Santa Margarita river (the Murrieta creek flow excepted) and the underground waters of the Temecula alluvial basin during the dry or irrigation season of the year, to wit, from the first day of May until the 31st day of October of the same calendar year, in excess of twenty-five (25) per cent of the total flow of said Temecula-Santa Margarita river measured at Temecula Gorge. . . ."

Obviously, the findings heretofore referred to, that respondent owns three times as much irrigable riparian acreage as do appellants, do not support an injunction prohibiting the use of the water by appellants on their riparian lands for reasonable and beneficial purposes when and while respondent is not using it. It is true that appellants alleged in their answer their intent to take from the stream far more water than they are lawfully entitled to, and it is likewise true that respondent is entitled to an injunction prohibiting appellants from taking water so as to improperly injure respondent. But whether respondent has in fact been injured depends upon its present needs and uses, and not upon the extent of its ownership of irrigable riparian lands.

It is respondent's position that the findings establish that during the irrigation season of the year it has an actual

and present need for 75 per cent of the summer surface flow of the river, and that respondent is now putting that portion of the surface flow to a reasonable beneficial use. These contentions are admittedly founded on respondent's position that, when not interfered with by appellants, the Temecula-Santa Margarita River is a perennial surface stream, and that respondent, as a downstream riparian owner, is legally entitled to the preservation of that surface stream and cannot be compelled to resort to pumping or reservoiring in order to assist appellants.

If respondent is entitled, as a matter of law, to the maintenance of the stream as a surface stream, regardless of appellants' needs, and regardless of the ease with which water can be extracted from the underground basins, there can be little doubt that the findings support the injunction.

In finding 4 the trial court found: "The soil of the said Santa Margarita ranch riparian and immediately contiguous to the said stream and lying in the valley thereof has always been naturally moistened by the water of the said stream, when not artificially diverted therefrom by the said defendants as herein found, and will, if not so diverted, continue to be moistened and made productive of natural forage, plants, and other useful vegetation, and the growth of artificially planted crops on the same has always been promoted, and will, if the said water is not so diverted, continue to be promoted by the flow of said stream in its natural course, as well as by the flow of the stream when applied by artificial means on the said riparian lands. That the water of the said stream does naturally diffuse, and always has diffused, itself into and through the lands contiguous and neighboring to the banks of said stream, saturating large deposits of underground sands and other material in the valley of the stream and neighboring thereto, thus forming and supporting underground stores of water from which the plaintiff and its predecessors in the ownership of said Santa Margarita ranch have always been accustomed to obtain water by pumping and other means for beneficial purposes on said ranch. At divers depressions in the said riparian lands of the plaintiff, the water flowing in said stream, as well as diffused from said stream in the material of the valley riparian thereto, has always collected, and will continue to collect, in surface pools, if the said stream is not diverted from its natural

channel by the defendants before it reaches the plaintiff's said ranch, and to such collections of water the cattle and other livestock of the plaintiff and its said predecessors have always been accustomed to resort for drinking."

In finding 5 the court found that for the past 40 years respondent and its predecessors have taken "all the water of said stream in the dry or irrigating season of the year naturally descending to the said Santa Margarita ranch and not absorbed in the channel and banks of the stream and diversion ditches leading therefrom, and has applied and devoted, and plaintiff yet applies and devotes such water to the watering of livestock owned and maintained by such successive owners of the said ranch, to the number of several thousand head, and to the irrigation of lands of the said Santa Margarita ranch riparian to the said stream, and the production of alfalfa, vegetables and other crops, to the extent, in all, of from about one hundred (100) to eight hundred (800) acres in different years". The court, it will be remembered, found that respondent owned in all 38,739 riparian acres, of which 12,375 acres are susceptible of profitable irrigation. Also in finding 5 the court found: "All the livestock of the plaintiff pasturing on its said lands above the Lake O'Neill reservoir and along said river channel for a distance of approximately eight (8) miles are dependent upon the flow of water of said stream in the channel thereof for a reasonable supply of water for drinking. That said predecessors of plaintiff were accustomed, and after the plaintiff has been accustomed, to use said water for domestic and other beneficial purposes on said riparian lands in said ranch. The water of said stream was and is obtained for the uses of plaintiff (when not prevented by the diversions of defendants) from the surface channel flow thereof, and also by pumping from saturated lands riparian to said stream, into which such water naturally seeps and percolates from the channel of said stream and also from pools in such channel and in lands riparian thereto."

There are several other findings in reference to the practice of respondent or its predecessors, for many years of pasturing and watering its livestock from the surface stream and from Lake O'Neill reservoir, and that these sources are "virtually the sole source of supply of water for the uses and purposes to and for which the said lands of the plaintiff in the said

watershed are susceptible''. There are other findings to the effect that for the watering of livestock and irrigation by respondent during the dry months the full flow of 75 per cent of the surface stream is necessary.

The findings also disclose that in 1923 and thereafter, after appellants had increased their diversions in that year, there occurred a failure and deficiency in the surface stream to the injury of respondent. Finding 16 states that ''plaintiff, about the month of July, 1923, observed for the first time a failure and deficiency in the quantity of water flowing in the channel of said stream . . . '' Apparently no injury at all was suffered prior to 1923 and the injury then and thereafter occurring was a deficiency in the surface flow. The court also found that in 1923, 1924, 1925 and 1928, the surface stream, by reason of appellants' excessive diversions, dried up six miles further upstream than formerly, so that cattle could not secure water from the surface flow. There was no injury at all during the years 1926 and 1927, years of heavy rainfall. In the years that damage did occur, in finding 19 it is stated: ''By reason of the diversions of water made by said defendants on and to said Pauba grant, Temecula grant, Little Temecula grant and Vail government lands as herein found, and their practice of winter irrigation during the autumn, winter and spring of the seasonal years 1923–24, 1924–25, 1925–26 and 1927–28, the defendants so reduced the natural flow of said stream that, beginning about June 1st of each of said calendar years 1923, 1924, 1925 and 1928, the plaintiff could not receive and did not receive from the natural flow of said stream sufficient water to fill its said reservoir and to furnish water for livestock pasturing upon plaintiff's riparian land adjacent to and in the vicinity of the easterly boundary line of plaintiff's lands; and in consequence plaintiff had not enough water in said reservoir to irrigate the lands it had been accustomed to irrigate with water from said reservoir, and its irrigated crops in the summer of the years 1923, 1924, 1925 and 1928 were impaired as to quantity, but not as to quality, because of such deprivation of water, and plaintiff was compelled to and did resort, in each of said years 1923 to 1928, inclusive, excepting 1926 and 1927, to artificial means for securing water for said livestock pasturing as herein found on that portion of said Ranch Santa Margarita in the vicinity of

the eastern boundary line thereof. That the same insufficiency of water to fill said reservoir and to supply said livestock, and the consequences thereof, will continue in the future if the defendants are permitted to maintain their diversions from said stream as heretofore in said years 1923 to 1928, inclusive, and as threatened and intended by them, as herein found.''

The evidence shows that the ''artificial means'' to which respondent ''was compelled to and did resort'' in the years mentioned to water its cattle consisted in scraping out shallow water holes about 50 feet square in the bed of the stream where the water level was about 1 foot below the bed of the stream.

No useful purpose would be served in further reviewing the findings pertaining to damage. An examination of all of them discloses that the damage and injury relied upon to sustain the granting of the injunction consists of two factors: (1) that from 1923 to 1928, but not including 1926 and 1927, there has been a deficiency in the surface stream so that along certain portions thereof cattle have not been able to water directly therefrom, and (2) the respondent has been unable in those years to fill Lake O'Neill reservoir from the surface flow and has suffered a lack of water for irrigation purposes. There is not one word in the findings that there has ever existed a deficiency in the underground basins on respondent's property which are filled by the flow of the Temecula-Santa Margarita River. As to the first element of damage, above set forth, the evidence does show that for 40 years cattle have been watered directly from the surface stream on respondent's property, with occasional assistance of pumping plants, and that from 1923 to 1928 (not including 1926 and 1927) the surface stream has dried up further upstream than formerly and respondent has been forced to scrape out water holes in the bed of the stream, where, according to respondent's own witnesses, water could be found a foot from the surface. As to the reservoir, the court found that the dam creating it is not erected until the middle of March, and the evidence shows that large quantities of water are allowed to run into the sea prior to the middle of March of each year.

Throughout its findings and judgment the trial court uses the expression that the respondent ''owns'' and

is entitled to take and use upon its riparian lands seventy-five per cent of the total flow of the river. The quoted expression is used not only in the portion of the findings and judgment referring to the rights of the parties, but also in the portions dealing with the injunction. This, at least, was an unfortunate use of terms. The riparian does not "own" the water of a stream—he "owns" a usufructory right—the right of reasonable use of the water on his riparian land when he needs it. (*Gould* v. *Eaton*, 117 Cal. 539 [49 Pac. 577, 38 L. R. A. 181].) If one riparian has no present need for water the others may use it all. The lower riparian cannot secure an injunction against the upper riparian unless the upper owner is using an excessive portion of the waters of the stream resulting in actual damage to the lower proprietor. (*Coleman* v. *LeFrank*, 137 Cal. 214 [69 Pac. 1011]; *Anaheim Union Water Co.* v. *Fuller, supra; Oliver* v. *Robnett*, 190 Cal. 51 [210 Pac. 408].) The same principles apply to underground waters. (*Katz* v. *Walkinshaw*, 141 Cal. 116 [70 Pac. 663, 74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236]; *Peake* v. *Harris*, 48 Cal. App. 363 [192 Pac. 310].) ▮ Moreover, it is also well established that the underground and surface portions of the stream constitute one common supply. (*Hudson* v. *Dailey*, 156 Cal. 617 [105 Pac. 748]; *City of Los Angeles* v. *Pomeroy*, 124 Cal. 597 [57 Pac. 585].)

The trial court was undoubtedly aware of these principles. However, it seems to have been the theory of the trial court that the respondent, under the circumstances, was entitled to the continuation of the surface stream and could not be compelled to resort to the underground basins fed by the stream to supply its needs as against appellants. The trial court was consistent on this issue throughout the trial. It clearly took the position that the quantity of water available to respondent in the underground basins was an immaterial factor. In fact, as will appear under point 4, *infra*, the trial court excluded evidence offered by appellants as to the extent of these basins. According to several of appellants' exhibits offered for other purposes the basins have a storage capacity of over 50,000 acre-feet above sea level, and the water level ranges from 1 to 7 feet from the surface.

Respondent takes the position that it, as a lower riparian, is entitled to its portion of the surface flow of the stream

556

regardless of the needs of the upper riparians, regardless of the quantity of water available in the underground basins fed by the river, and regardless of the ease with which water can be extracted from these basins, and that it cannot be compelled as against appellants to resort to its underground basins to fill, in whole or in part, its reasonable needs. Stated in another way, respondent contends that the underground basins filled to the brim serve a reasonable beneficial purpose in supporting the surface flow.

We cannot say as a matter of law, applicable to every case, that the use of underground basins simply to support the surface flow in order that use may be made of the surface flow, is or is not a reasonable beneficial use. That is a question of fact that must be passed upon in each case. The important factor in the present case is that the trial court ruled, in effect, that it would not pass on this question of fact, but would hold that as a matter of law the quantity available in the basins was a totally immaterial factor.

In a case like the present one, with a relatively small quantity of water available far insufficient to meet all the needs therefor, the court should not grant an injunction until every reasonable physical solution, and every reasonable source of supply, has been thoroughly investigated. Neither respondent nor appellants are entitled, as a matter of law to supply their needs entirely from the surface stream if they can economically secure water from the underground basins. The rule is that, as between riparians each party must make a reasonable use of all of the water of the stream, and as already pointed out, that includes both surface and subsurface flow, and likewise includes water in the underground basins. The respondent recognizes this rule of reasonable use, but contends that as between riparians it is a reasonable beneficial use to require the basins to be kept full in order to hold up the surface flow and relies squarely on *Herminghaus* v. *Southern Calif. Edison Co.*, 200 Cal. 81, 107 [252 Pac. 607], to support its position. Since the decision in that case a new section has been added to the Constitution of the state—article XIV, section 3, the effect of which has been to materially change the water law of this state. The effect of this amendment has recently and exhaustively been discussed by this court in several cases—*Gin S. Chow*

v. *City of Santa Barbara,* 217 Cal. 673 [22 Pac. (2d) 5] ; *Peabody* v. *City of Vallejo,* 2 Cal. (2d) 351 [40 Pac. (2d) 486] ; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.,* 3 Cal. (2d) 489 [45 Pac. (2d) 972] ; *City of Lodi* v. *East Bay Mun. Utility Dist.,* 7 Cal. (2d) 316 [60 Pac. (2d) 439]. In the Peabody case, one of the uses to which the water was being put was to use the full flow of the surface stream to maintain the underground and percolating water supply by pressing water into the riparian lands as an aid in maintaining the level of the underground supply. After holding that the doctrine of reasonable use was applicable to contests between riparians and appropriators, the court pointed out that the rule of *Miller* v. *Bay Cities Water Co.,* 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772], approved in the Herminghaus case, *supra,* to the effect that the use of the full flow of the stream to maintain the underground supply was a proper use, had been modified by the constitutional provision above referred to, and that under the facts this use was not a reasonable beneficial use. In the City of Lodi case, *supra,* the existing law on this subject was summarized as follows (p. 338) : ''But *Miller* v. *Bay Cities Water Co., supra,* in so far as it held that the full flow of a stream may be used to force a relatively small quantity of water into adjoining underground basins, and that a prior appropriator is entitled to an injunction to maintain this natural condition even where the prior appropriator's right may be fully protected by the use of a much smaller quantity of water, is no longer the law of this state. In *Peabody* v. *City of Vallejo,* 2 Cal. (2d) 351 [40 Pac. (2d) 486], after discussing the major changes in the water law of this state made necessary by the 1928 constitutional amendment, and after pointing out the theory and effect of that amendment on riparian rights, and after pointing out that overlying owners or appropriators, under the theory of *Katz* v. *Walkinshaw,* 141 Cal. 116 [70 Pac. 663, 74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236], possess rights analogous to those possessed by riparian owners, and after discussing at length the rules of law set forth in *Miller* v. *Bay Cities Water Co., supra,* this court stated:

'' 'Notwithstanding the common law rule to the contrary, this court, in the cases referred to, accorded to the underlying and percolating water right a status analogous to the

riparian right. The attitude of some of the plaintiffs herein in effect is that, possessing that status they are entitled to have the underground waters flow and percolate as in a state of nature regardless of the quantity of the supply or the reasonableness of use. But since the riparian right as against an appropriator has by the new state policy been subjected to the doctrine of reasonable use, no good reason has been advanced why the asserted underground and percolating water right should not be subjected to the same regulation as against an appropriator. In whatever respects the Miller case, or any other case, may be said to hold otherwise, they must be deemed to yield to the new constitutional policy with reference to the use of the waters of the state.' '' Under the facts of these cases it was held not to be a reasonable beneficial use to use the full flow of the stream to maintain the underground supply. That is, of course, not exactly the situation here presented. In the present case it is respondent's contention that it is entitled to maintain its underground basins full in order to support the surface stream in order that it can water its cattle from the surface. However, the two situations are comparable. We cannot say as a matter of law that in all cases the maintenance of full underground basins to maintain a surface supply would or would not be a reasonable beneficial use. However, it seems quite clear that, in ascertaining whether a lower riparian has suffered damage by reason of an upper riparian's diversion sufficient to warrant an injunction, the trial court should take into consideration all of the water available to either party from the river, and then determine, considering the entire supply, the needs of the parties, their methods of use and methods of diversion and other necessary factors, whether the lower riparian has in fact suffered damage. This the trial court failed to do. The trial court proceeded on the theory that it had only to deal with the surface stream, and that it was not necessary for it to deal with the extent of the supply available to respondent for reasonable use in the underground basins.

Another point that should be mentioned is that, in considering whether an injunction should be granted in such a case, it is the duty of the trial court to ascertain whether there is a physical solution of the problem that will avoid waste and which will not unreasonably or adversely affect

the rights of the parties. No injunction should be granted if its effect will be to waste water that can be used. Article XIV, section 3 of the Constitution provides that: "It is hereby declared that because of the conditions prevailing in this state the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this state is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." Under this section it has been held that it is not only within the power, but it is the duty of the trial court, to work out, if possible, a physical solution, and if none is suggested by the parties to work out one independently of the parties. In this connection, if the trial court needs or desires expert assistance or evidence on this, or any other phase of the case, it possesses the statutory power either to refer the matter to the division of water rights, or to appoint it as an expert. (*Peabody* v. *City of Vallejo, supra,* p. 374; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Dist., supra,* p. 575; *City of Lodi* v. *East Bay Mun. Utility Dist., supra,* p. 341.) The instant case presents an excellent illustration of the benefits to be secured from the exercise of this power. The evidence in this case discloses that the water commission is already aware of some of the problems of these litigants. As early as 1919 appellants filed applications with the commission for permission to build a dam and diversion works on its properties to conserve some of the winter run off. Respondent protested the application. In 1925 appellants filed another such application. The appointment of the commission as a referee or expert, under such circumstances, might well facilitate the work of the trial court.

These prior applications may contain the germ of a physical solution of the problem here presented. It may be that there are storage and reservoir sites so located on appellants' ranch,

that by the diversion and storage of winter waters that now go to waste, supplemented perhaps by a small portion of the summer flow, appellants can secure all the water they reasonably need. Perhaps by regulating the releases from such reservoirs in the summer months surface flow can be made available to respondent. On the other hand, there may also be reservoir and storage sites on respondent's property whereby, by the expenditure of reasonable sums of money, winter water can be conserved and released in the summer months. In fact in finding 20 the trial court, after finding that respondent is making a reasonably scientific use of the available water, found that during periods of heavy rainfall large amounts of water flow into the sea and that ''such waters as now flow and have heretofore flowed into the Pacific Ocean are largely, but not entirely, capable of being impounded on the lands of the plaintiff and stored for distribution for useful and beneficial purposes on said lands''. In the same finding, after referring to Lake O'Neill reservoir the court found ''that by the expenditure of reasonable sums of money the artificial dam at said Lake O'Neill reservoir may be increased in height and the point of diversion of the ditch leading into said reservoir may be moved upstream and the capacity of said reservoir increased, and the amount of water capable of being stored therein for beneficial uses on said ranch also increased''. It may also be possible to install pumping plants upstream from the reservoir so as to provide drinking places for respondent's cattle.

These suggestions are made simply to point out that from the findings and evidence it would appear that there is a strong possibility of working out some physical solution, at reasonable cost, that may be of benefit to both parties. With the small quantity of water available in this stream in the summer months, the trial court should thoroughly investigate the possibility of some such physical solution, before granting an injunction that may be ruinous to either or both parties.

It must be remembered that in this type of case the trial court is sitting as a court of equity, and as such, possesses broad powers to see that justice is done in the case. The state has a definite interest in seeing that none of the valuable waters from any of the streams of the state should go to waste. Each case must turn on its own facts, and the

power of the court extends to working out a fair and just solution, if one can be worked out, of those facts.

In the present case the trial court on the retrial may determine that, considering all the factors above mentioned, respondent is entitled to the maintenance of the surface flow as provided in its present judgment. Obviously the watering of cattle is a reasonable beneficial use, and if they can only be watered from the surface stream without unreasonable expenditure, respondent may be entitled to such an injunction. On the other hand, it would be an unreasonable use to require the flow of the surface stream if such cattle can reasonably be watered at reasonable expense by some artificial means. As several times already pointed out, neither riparian is entitled to the full flow of the stream as it existed in a state of nature. Each is required to make a reasonable use of the waters of the stream, and either or both can be required to endure a reasonable inconvenience or incur a reasonable expense in order that water may be reasonably used by the other. (*Waterford Irr. Dist.* v. *Turlock Irr. Dist.*, 50 Cal. App. 213 [194 Pac. 757]; *Peabody* v. *City of Vallejo, supra*, p. 376.) However, considering all the required factors, the lower owner cannot be expected or required to endure an unreasonable inconvenience or to incur an unreasonable expense in order to make more water available for the use of the upper riparian. If on the new trial it shall develop that the only feasible physical solution will involve the expenditure of large sums of money by respondent, and that the sum required, when all the facts, including the necessities and uses of the parties, are considered, is unreasonable, the trial court has full power to make its injunctive order conditional so as to require appellants to bear a portion of the expense. In other words the trial court, if the facts warrant it, can grant an injunction in favor of respondent unless appellants agree to bear a fair proportion of the expense necessary to construct the required improvements on respondent's ranch. This would appear to be a fair, just and equitable rule. If appellants, as upstream owners, desire to use more than their fair share of the available flow, and if they desire to require respondent to supply its needs in whole or in part from the underground basins or from storage, and if this would impose an unreasonable expense on respondent, appellants should be required,

562

if they want the water, to bear their reasonable share of the expense in making it available. All these matters can be thoroughly investigated on the retrial.

 That the trial court failed to give consideration to the underground basins on respondent's property is demonstrated when appellants' fourth contention is considered. Appellants contend that the trial court erroneously sustained objections to testimony offered by them on this issue. In order to understand the contentions of the parties on this point a reference must be made to what the record discloses in reference thereto.

It is there disclosed that while one of appellants' expert witnesses was on the stand appellants' counsel asked the witness a question concerning tests made by the witness of certain wells in the San Luis Rey Valley—a valley adjoining respondent's ranch. Respondent's counsel objected to the question on two grounds: (1) that a proper foundation had not been laid in that it was not proved that there was any similarity between the San Luis Rey basin and the Santa Margarita basin; and (2) that even if such similarity existed, any evidence regarding the underground water resources on the Santa Margarita ranch was incompetent, irrelevant and immaterial. This objection precipitated a lengthy argument consuming several full trial days. An examination of the portion of the argument contained in the bill of exceptions discloses that the parties at the suggestion of the trial court devoted the major portion of the discussion to the second objection. This was so for obvious reasons. The first objection could be easily cured by proffering the evidence necessary to lay the proper foundation, but the second objection, if sustained, would prohibit the introduction of any evidence at all on one of appellants' main theories. The respondent's counsel took the position that on the issues presented, the quantity of water available in the underground basins on respondent's property was a totally immaterial factor. The following quotation from respondent's discussion before the trial court fairly discloses the position there taken by it (vol. 4, Trans., pp. 1644–1646), ''Now, carrying the analogy to the matter of underground basins, if we have a large underground basin, or, as might be reasonably supposed, the defendants are contending a number of underground basins, two or three, let us say, are we

entitled to any lesser or greater proportion of the water that flows in the stream because of the existence or nonexistence of these basins? I do not think so. I do not think there is anything in the decisions which justifies the conclusion that the facility or practicability or ease or difficulty of one of the parties to the litigation conserving his proportionate share of the water in any manner determines what his proportionate share shall be. I think there are not in these decisions which schedule, enumerate the criteria or *indicia* which should guide the court in determining the allotment or apportionment of water. I think that in none of these decisions is there scheduled the facility of the party to impound his proportionate share. I think that these decisions do not mention that at all. If our land has an underground basin from which we may pump water, that is a benefit, a natural benefit which that land enjoys. That has not anything to do with the amount of water which should be apportioned to us at our ranch line. In other words, the question of riparian right is involved. There is not in the decisions as I read them, any statement which justifies the court in substituting for the riparian right which the land enjoys, the duty, the necessity, the expense and inconvenience of resorting to pumps, or to some means other than the natural diversion of the flow of the stream. I think that the most recent announcement of the Supreme Court on the subject is diametrically opposed to any such contention, and even at the expense of taking up ten or fifteen minutes of the court's time, I would like to read a paragraph or two from the Herminghaus case on this point." From the record it appears that the relevancy of such testimony had been presented to the trial court on several prior occasions. For that reason the trial court welcomed a full discussion of the subject. After the argument the trial court sustained the objection. The court recognized that it could make its ruling solely on the first objection, but stated that he welcomed the broader discussion, and clearly and unequivocally indicated that the objection was being sustained on the second ground. In that connection the record discloses that the court first stated that in its opinion a proper foundation had not been laid and then stated (vol. 3, Trans., pp. 1654, 1655): "But I would prefer, inasmuch as the argument has been quite considerable, and has developed a feature of the case which

we have to consider sooner or later, and we have certainly been considering it during the last day, I would prefer to consider it, consider the objection on the broader ground that counsel have adverted to and have given most of their time and attention to, that it is entirely incompetent and irrelevant and immaterial to the issues that are presented. With the contention I am constrained to agree, although it is not by any means a simple matter for me to do so. I am constrained to agree with counsel for the plaintiff in their contention, for this reason, it seems to me that were I to hold otherwise I would place myself in direct conflict with the law of riparian ownership as I understand it to be, and as I think that it is rather definitely established in this latest decision which we have already had under discussion during the last day, the Herminghaus case.'' The court explained its position at some length and concluded ''For the reasons that I have stated the objection is sustained.'' Respondent does not seriously contend that the evidence was incompetent, but urges that ground one of the objection was good; that both grounds were sustained by the trial court; that where any ground of an objection is good the action of the trial court must be sustained. That is, of course, a sound rule of law, but it is not applicable here. A reading of the court's ruling clearly indicates that the objection was sustained solely on ground two. It is true that immediately after the objection was sustained appellants' counsel stated that he intended later in the trial to make a formal tender so that a ''proper'' objection and a ''proper'' ruling could be made, but the record also clearly discloses that both of the litigants thereafter in the trial, and the court, recognized that the ruling above mentioned was a final ruling on the matter. Later in the trial another witness was asked by appellants' counsel concerning the availability of water on the Santa Margarita ranch. Immediately Mr. Cosgrove, attorney for respondent, objected, stating (vol. 5, Trans., pp. 2376, 2377) : ''We object to the question on the ground it is incompetent, irrelevant and immaterial, and has no tendency to prove any of the issues in this case. We argued out at considerable length, as I understood it, this question of whether or not the amount of water that could be developed down in the Santa Margarita Ranch from the underground basins, was relevant to the issues in this case, and as I understand the ruling of

the court, after having the matter under advisement, and hearing argument at some considerable length, the ruling of the court was, that it is not admissible. We respectfully submit that the question of the porosity of the ground in the Santa Margarita has nothing to do with this matter at all. There is not involved in this case, as I understand it, anything about how much water can be developed by pumps in the Santa Margarita, or how much we can store." Counsel for appellants then stated his position as follows (Trans., vol. 5, pp. 2377, 2378) : "I understand why counsel would object, but that is not the purpose at all. I apprehended they would probably think that was the purpose, but the purpose is to show how much water they will need to keep that basin filled up to where they can grow their wild grasses, as they say they have a right to, and where they can water their stock. That is something they cannot get away from, they put in reams and reams of testimony on that subject, and we have a right to show how much water they will require for that purpose, and that is what this tabulation means; I am not going to ask how much water can be withdrawn from that basin at all; I have taken Your Honor's ruling on that, we have the benefit of the exceptions which the law gives us, but we do have a right to show how much water it will take to keep their water plane up for their wild grasses, and where the river will run, and furnish them water for their stock, as they claim they are entitled to."

This was error of a most serious nature. The evidence, for reasons already stated, was clearly admissible on one of the basic issues involved in the litigation.

The appellants' fifth and last contention is that the method imposed by the judgment for the measurement of the water is unsupported by the evidence, is erroneous, and in various particulars, violates substantial rights of appellants. In view of the reversal this point need not be discussed. The alleged errors in reference thereto, if any exist, are not likely to occur on the retrial.

From what has heretofore been stated in this opinion it is obvious that a reversal of the judgment is necessary. However, the new trial need not be a protracted one. Appellants have not challenged many of the findings. There is no need for a new trial on those issues. It would appear that on the new trial it will be necessary: (1) to ascertain the extent of

appellants' riparian and irrigable acreage as set forth in the body of this opinion; (2) to ascertain the extent of respondent's riparian and irrigable acreage only in so far as it involves the table land, discussed in the body of this opinion; and (3) to ascertain whether an injunction should be granted under the rules set forth in the body of this opinion, and if so, what its terms should be.

With this direction to the trial court, the judgment appealed from is reversed.

Rehearing denied.